# United States Court of Appeals
## For the First Circuit

No. 04-1841

STEPHEN P. MEDEIROS,

Plaintiff, Appellant,

v.

FREDERICK J. VINCENT, INTERIM DIRECTOR OF THE RHODE ISLAND
DEPARTMENT OF ENVIRONMENTAL MANAGEMENT, AND
ATLANTIC STATES MARINE FISHERIES COMMISSION,

Defendants, Appellees,

and

UNITED STATES OF AMERICA,

Intervenor, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Mary M. Lisi, U.S. District Judge]

Before

Boudin, Chief Circuit Judge,

Campbell and Cyr, Senior Circuit Judges.

Robert J. Caron for appellant.

Paul A. Lenzini, with whom Gary Powers, Department of Environmental Management, and Terence Tierney, Department of Attorney General, were on brief for appellees.

R. Justin Smith, Environmental and Natural Resources Division, U.S. Department of Justice, with whom Thomas L. Sansonetti, Assistant Attorney General, Andrew Mergen, and John A. Bryson, U.S. Department of Justice, were on brief for intervenor, appellee.

---

December 12, 2005

---

**CYR, <u>Senior Circuit Judge</u>.** Stephen P. Medeiros appeals from a district court order dismissing the complaint he filed against the Rhode Island Department of Environmental Management (DEM), the Atlantic States Marine Fisheries Commission (ASMFC), and the United States, challenging the constitutionality of a DEM regulation restricting the number of lobsters which may be harvested by methods other than lobster traps. We affirm the district court order.

**I**

**<u>BACKGROUND</u>**

In 1942, with congressional approval, fifteen Atlantic coast states, as well as the District of Columbia, entered into a compact pursuant to which the signatories would exercise joint regulatory oversight of their fisheries (<u>viz.</u>, the area within three miles of their respective shorelines), primarily through the development of interstate fishery management plans ("IFMPs"). Each signatory is represented on the Atlantic States Marine Fisheries Commission (ASMFC). 16 U.S.C. § 5102(3).

Until 1993, the decision to participate in any IFMP was entirely voluntary. As compliance was spotty, Congress enacted the Atlantic Coastal Fisheries Cooperative Management Act, 16 U.S.C. §§ 5101-5108 (1993) ("ACFCMA"), which permits the ASMFC (i) to identify which IFMP terms it considers "necessary," <u>id.</u> § 5104(a)(1), and (ii) to require that all member states adopt and

-3-

comply with these terms. Id. § 5101(a)(4) ("The responsibility for managing Atlantic coastal fisheries rests with the States, which carry out a cooperative program of fishery oversight and management through the Atlantic States Marine Fisheries Commission. It is the responsibility of the Federal Government to support such cooperative interstate management of coastal fishery resources."). Should a member refuse to comply, the ASMFC may contact the Secretary of Commerce, id. § 5105(b), who makes a plenary determination as to whether (i) the particular IFMP term is indeed "necessary," and (ii) the member state is in noncompliance. Id. § 5106(a). Should the Secretary determine that the member state is not complying with an essential term, a moratorium on fishing may be imposed in the offending member state's coastal waters. Id. § 5106(c).

Approximately four-fifths of all Atlantic lobsters are harvested within the territorial waters of the Atlantic states (viz., within three miles of the shoreline), and an even greater percentage by means of lobster traps. A small percentage – for example, in Rhode Island, 1.62 percent – is harvested by trawling and netting. In December 1997, ASMFC promulgated an IFMP containing Amendment 3, after acquiring evidence suggesting that, despite years of heavy regulatory oversight, the Atlantic lobster

population was still being overfished.[1]  "Overfishing" is defined as "a rate or level of fishing mortality that jeopardizes the capacity of a fishery to produce the maximum sustainable yield on a continuing basis."  Id. § 1802(29).  Specifically, ASMFC determined that (i) ninety percent of recently harvested lobsters were young "recruits" which had just molted into the minimum legal size permitting their capture, and (ii) the loss of a population of more mature lobsters had resulted in a drastic diminution in lobster-egg production.

Thus, Amendment 3 promulgated a variety of "necessary" measures to ward off an impending catastrophic collapse of the Atlantic lobster stock.  As concerns harvesting by lobster trap, Amendment 3 reduced the number of traps allowed on a vessel, as well as the trap capacity and the size of the trap vents designed to allow smaller lobsters to escape.  With respect to non-trap lobstering methods, such as trawling and netting, Amendment 3 limited the daily harvest of lobsters to 100 per vessel, or 500 for vessels undertaking fishing expeditions of five days or more.  The Rhode Island Marine Fisheries Council (RIMFC) duly implemented the latter provision of Amendment 3 as RIMFC Regulation 15.18.  In June 1999, Medeiros was indicted in Rhode Island superior court after

---

[1]As the history of Atlantic lobster regulation is complex, we confine the present discussion to the facts most material to this appeal.  A more comprehensive historical overview may be found in Campanale & Sons, Inc. v. Evans, 311 F.3d 109, 112-14 (1st Cir. 2002).

-5-

his otter trawler landed 131 lobsters. The case was ultimately dismissed.

Some state officials were less than enthusiastic about Amendment 3. Mark Gibson, a former DEM official, and Jan H. Reitsma, a former director of DEM, stated that Amendment 3 was discriminatory and resulted in no genuine conservation benefit. In June 2000, over the strong objection of the Governor and the DEM, RIMFC repealed Regulation 15.18, and, pursuant to the Atlantic Coastal Act, ASMFC notified the Secretary of Commerce that Rhode Island was no longer in compliance with this "necessary" IFMP requirement. The Secretary agreed and announced an intention to impose a moratorium. However, in November 2000, Rhode Island reinstated Regulation 15.18, and stripped the RIMFC of its authority to rescind the ASMFC regulations. RIMFC is now a purely advisory body. See R.I. Gen. Laws § 20-3-2 (2001). Consequently, the moratorium never went into effect.

Medeiros submitted the instant complaint in state court against the ASMFC, the DEM, and the United States, alleging that Amendment 3 (as adopted through RIMFC Regulation 15.18) violates his rights to equal protection and substantive due process, and constitutes an unlawful "commandeering" of Rhode Island's legislative prerogatives under the Tenth Amendment. The defendants removed the case to the United States District Court for the District of Rhode Island. Thereafter, pursuant to cross-motions

for summary judgment the district court dismissed all counts in the complaint. Medeiros v. Atlantic States Marine Fisheries Comm'n, 327 F. Supp. 2d 145 (D.R.I. 2004). Medeiros appeals.

**II**

**DISCUSSION**

Cross-motions for summary judgment are reviewed de novo, and all facts, as well as reasonable inferences therefrom, are reviewed in the light most favorable to the respective non-moving parties, with a view to determining whether (i) a genuine issue exists as to any material fact and (ii) either moving party is entitled to judgment as a matter of law. See Barnes v. Fleet Nat'l Bank, 370 F.3d 164, 170 (1st Cir. 2004).

**A. The Equal Protection Claim**

First, Medeiros claims that Amendment 3 and Regulation 15.18 violate the Equal Protection Clause, in that their discrimination between trap and non-trap lobstering methods bears no rational relationship to the asserted governmental purpose: to conserve the dwindling Atlantic lobster stock.

Legislation or regulation which neither employs a suspect classification[2] nor impairs fundamental rights,[3] will survive

_____

[2]Medeiros concedes that, unlike a racial or ethnic minority, for example, see Mass. Bd. of Ret. v. Murgia, 427 U.S. 307, 312 n.4 (1976), non-trap lobstermen are not a "suspect class" for equal protection purposes. See Mills v. State of Me., 118 F.3d 37, 47 (1st Cir. 1997) (defining "suspect class" as "a class of persons characterized by some unpopular trait or affiliation . . . [that would] reflect any special likelihood of bias [against them] on the

-7-

constitutional scrutiny, provided the remedy is "rationally related" to a legitimate governmental purpose.  See Wine and Spirits Retailers, Inc. v. Rhode Island, 418 F.3d 36, 53 (1st Cir. 2005); Citizens Awareness Network, Inc. v. United States, 391 F.3d 338, 355 (1st Cir. 2004).  Remedial choices made by the appropriate legislative or regulatory body are invested with a strong presumption of validity, rebuttable only where the party challenging the legislation or regulation can establish that "there exists no fairly conceivable set of facts that could ground a rational relationship between the challenged classification and the government's legitimate goals."  See Wine and Spirits, 418 F.3d at 54 (citation omitted).

Regulation 15.18 was designed to ameliorate the

_____

part of the ruling majority") (citation omitted).

[3]At oral argument on the summary judgment motion, Medeiros intimated that Amendment 3 and Regulation 15.18 infringe upon his fundamental right to pursue the livelihood or occupation of his choosing: in this case, lobstering.  Both for equal protection and substantive due process purposes, however, see infra Section II.B, it is well settled that no such fundamental right exists, and that legislation or regulation impinging upon such a right therefore is subject only to "rational basis" review, rather than "strict scrutiny."  See, e.g., Dittman v. California, 191 F.3d 1020, 1031 n.5 (9th Cir. 1999); N.Y. State Trawlers Ass'n v. Jorling, 16 F.3d 1303, 1311 (2d Cir. 1994); Whittle v. United States, 7 F.3d 1259, 1262 (6th Cir. 1993); Sisk v. Tex. Parks and Wildlife Dep't, 644 F.2d 1056, 1058 n.5 (5th Cir. 1981) ("[F]ishing is not a fundamental right nor is the class of commercial fishermen a suspect class."); Cherenzia v. Lynch, 847 A.2d 818, 823-24 (R.I. 2004); cf. Piper v. Supreme Court of N.H., 723 F.2d 110, 112 (1st Cir. 1983), aff'd, 470 U.S. 274 (1985) (noting that right to make a living may be "fundamental" under the Privileges and Immunities Clause).

unprecedented overfishing of Atlantic lobster stocks, and the resulting diminution in the overall vitality of those stocks. The defendants proffer two principal rationales for the differing treatment which Amendment 3 and Regulation 15.18 prescribe for trap and non-trap lobstering.

Traps are a targeted, passive method for harvesting lobster. The lobster trap rests passively on the ocean floor awaiting the lobsters, which come for bait that is designed to attract nothing but lobsters. Normally, newly molted lobsters, or "soft shedders," are not caught in traps, in part because the vents in the traps permit smaller lobsters to escape from the trap. Unless the smaller lobsters can escape, there cannot be a sufficient population of mature lobsters capable of egg production, and the ASMFC's goal of rebuilding the Atlantic lobster stocks would be threatened.

In contrast, non-trap methods, e.g., bottom trawling, are both non-passive and non-selective. For the most part, the lobster is a coincidental and insignificant by-catch for trawlers fishing primarily for finfish. The trawler nets actively dredge the ocean floor, catching whatever species may be in their path and large enough to be caught in the mesh, and the act of trawling the bottom may cause significant shell damage to the vulnerable population of soft shell lobsters. The relatively small openings required in trawler nets in order to catch most finfish species also lead to

the capture of numerous soft shedders, which likewise causes a diminution in overall egg production. For instance, seventy percent of the 131 lobsters seized from the Medeiros vessel in June 1999 were soft shedders, many of which were moribund.

Given these inherent differences between the trap and non-trap methods, these defendants opted to impose different limitations on each. Trap methods are more amenable to "input" controls, <u>viz.</u>, limiting the number and size of lobsters which will be caught in the first instance. Accordingly, Amendment 3 limited the number of traps per vessel or expedition, their overall capacity, and the minimum size of their escape vents.[4]

On the other hand, such input controls were simply a less practicable and efficacious methodology for use in non-trap lobstering. For instance, had defendants prescribed that the mesh openings in a trawler net were to be made significantly larger to enable the escape of small lobsters, the trawlers' primary catch of finfish would be necessarily and severely diminished as well. ASMFC rationally adopted the 100/500 limitation because it would

---

[4]At oral argument Medeiros suggested, absent record support, that these limitations upon trap methods are entirely illusory, inasmuch as they do not restrict the number of times lobstermen may empty and reset traps. We disagree. If one trapper is allowed ten traps, and another only two, and we assume that each trapper has the same incentive to maximize his profits by resetting his traps as many times as is practicable (<u>viz.</u>, allowing a sufficient time interval for capture), it logically follows that the trapper with only two traps is likely to catch fewer lobster in any given allotted time period. The same reasoning applies to the reductions in the capacity of each trap imposed pursuant to Amendment 3.

reasonably account for the historical, coincidental capture of lobster during finfish trawling, while deterring trawlers from deliberately targeting more lobster. Thus, ASMFC decided to impose "output" controls upon non-trap methodologies.

The defendants point out as well that limitations upon non-trap methodologies are essential, in that even though the lobster by-catch on the part of fishing vessels presently employing non-trap methods constituted a relatively minor percentage of the overall lobster harvest,[5] fishing vessels confronted with ever-diminishing finfish stocks and/or with increasing regulatory limitations upon finfish harvesting or trap lobstering might turn increasingly to unregulated non-trap lobstering. Since non-trap methods have proven most destructive to the vulnerable population of soft shed lobsters, such a potential redirection of the vessels' efforts into non-trap lobstering eventually would undermine the essential aims of Amendment 3 and Regulation 15.18.

Medeiros maintains that these asserted reasons do not constitute a rational basis for equal protection purposes. He cites to the written opinions of Mark Gibson, a former DEM official, and Jan H. Reitsma, a former director of DEM, who opposed the 100/500 limit because (i) it would discriminate by placing catch limits on the non-trap sector, but none on the trap sector,

---

[5]For example, by the year 2000, merely 1.62 percent of Rhode Island lobster landings were effected by non-trap methods.

and (ii) offered no conservation benefit, since non-trap landings constitute but a small fraction of the total lobster catch.

However sincere these officials may have been in regard to the usefulness of the 100/500 lobster catch limits, their opinions cannot satisfy the daunting burden of demonstrating that the 100/500 limit has no conceivable rational basis. See McDonald v. Bd. of Election Comm'rs, 394 U.S. 802, 809 (1969) ("Legislatures are presumed to have acted constitutionally . . . ."); Wine and Spirits, 418 F.3d at 53. A legislative or regulatory body is entrusted with "substantial latitude to establish classifications that roughly approximate the nature of the problem perceived." Gary S. v. Manchester Sch. Dist., 374 F.3d 15, 22 (1st Cir.) (citation omitted), cert. denied, 125 S. Ct. 505 (2004). Once a rational basis is identified, we must uphold the statute or regulation even in cases when there is no empirical data in the record to support the assumptions underlying the chosen remedy. See Powers v. Harris, 379 F.3d 1208, 1217 (10th Cir. 2004); Donahue v. City of Boston, 371 F.3d 7, 15 (1st Cir.) (noting that reasons need not be supported by record, and any "'plausible' justification will suffice") (citation omitted), cert. denied, 125 S. Ct. 498 (2004); Starlight Sugar, Inc. v. Soto, 253 F.3d 137, 146 (1st Cir. 2001).

Amendment 3 and Regulation 15.18 reasonably "discriminate" by imposing "output controls" upon non-trap methods,

-12-

as these methods are not amenable to the type of "input controls" imposed upon the trap sector. The defendants aptly note that any attempt to place comparable restrictions upon the non-trap sector would be unworkable. For example, any requirement that trawling nets have larger openings in their mesh would result in the coincident loss of finfish, the trawlers' primary catch. Moreover, even if practicable input controls could be placed upon the non-trap sector, the dredging method inherently poses a greater risk of lobster mortality not presented by the trap sector. See N.Y. State Trawlers Assocs. v. Jorling, 16 F.3d 1303, 1309-10 (2d Cir. 1994) (upholding against equal protection challenge a statutory prohibition on lobster trawling, based upon demonstrable damage to lobster populations from trawling method).

The reliance by Gibson and Reitsma upon the relatively small percentage of non-trap landings is similarly unavailing. First, the conclusion which they draw – that the 100/500 limit has "no" conservation benefit – is demonstrably false; at the very least, the 100/500 limit would have some (albeit small) conservation benefit commensurate with the relative size of the non-trap sector. More importantly, a statute or regulation is not lacking in a rational basis simply because it addresses a broader problem in small or incremental stages. See City of New Orleans v. Dukes, 427 U.S. 297, 303 (1976). It is only necessary that there be some rational relation between the method chosen and the

intended result.  And it cannot be gainsaid that it is entirely plausible to anticipate that the 100/500 limit likely would decrease the non-trap harvesting of lobster to the extent such unrestricted harvesting previously occurred.

The yet more fatal fallacy in the Medeiros argument is that it conveniently ignores the assertion that the defendants designed the 100/500 limit as a prophylactic measure to prevent any future redirection of efforts from trap lobstering and finfishing into non-trap lobstering methods.  As this court has noted, "those attacking the rationality of the legislative classification have the burden 'to negative every conceivable basis which might support it[.]'"  Abdullah v. Comm'r, 84 F.3d 18, 20 (1st Cir. 1996) (quoting  FCC v. Beach Communications, 508 U.S. 307, 315 (1993)) (emphasis added; citation omitted).  In an industry increasingly subjected to severe restrictions designed to enable the replenishment of rapidly dwindling fishing stocks, it was entirely rational for defendants to conclude that any opening left in the regulatory net could entice fishermen to venture an advantageous escape.

As surely as the opinion of the two DEM officials cannot be successfully utilized to second-guess the ASMFC's prerogatives, neither may the  court second-guess such regulatory judgments. See Beach Communications, 508 U.S. at 313 ("[E]qual protection is not a license for courts to judge the wisdom, fairness, or logic of

-14-

legislative choices."); Dukes, 427 U.S. at 303 ("[T]he judiciary may not sit as a super legislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines."); LCM Enters. v. Town of Dartmouth, 14 F.3d 675, 679 (1st Cir. 1994); Baker v. City of Concord, 916 F.2d 744, 749 (1st Cir. 1990).

As the district court correctly concluded that Medeiros could not establish at trial that Amendment 3 and Regulation 15.18 lack any conceivable rational basis, it properly granted summary judgment for the defendants on the instant claim.

## B. The Substantive Due Process Claim

Medeiros appeals as well from the district court ruling that he failed adequately or distinctly to plead the claim that Amendment 3 and Regulation 15.18 violate his right to substantive due process. Medeiros maintains that he adequately alleged that the regulations infringed upon his "fundamental right" to make a living, thereby triggering the heightened "strict scrutiny" standard of review.

However, at oral argument Medeiros conceded that the identical analysis applied to the equal protection and due process claims. If Medeiros alleged an infringement of a fundamental right, both claims were subject to "strict scrutiny" analysis. Otherwise, both claims were governed by the "rational basis"

-15-

standard of review.

The right to "make a living" is not a "fundamental right," for either equal protection or substantive due process purposes. See N.Y. State Trawlers, 16 F.3d at 1309-12; supra note 3. Thus, Amendment 3 and Regulation 15.18 must be upheld against the Medeiros substantive due process challenge, in that, as we have already noted, see supra Section II.A; E. Enters. v. Chater, 110 F.3d 150, 159 (1st Cir. 1997) ("[A] court must apply substantially the same [rational basis] analysis to both substantive due process and equal protection challenges."), both are rationally related to the legitimate governmental purpose of lobster conservation. See PFZ Props., Inc. v. Rodriguez, 928 F.2d 28, 31-32 (1st Cir. 1991) ("The doctrine of substantive due process 'does not protect individuals from all [governmental] actions that infringe liberty or injure property in violation of some law. Rather, substantive due process prevents "governmental power from being used for purposes of oppression," or "abuse of government power that shocks the conscience," or an "action that is legally irrational in that it is not sufficiently keyed to any legitimate state interests."'") (citations omitted). Accordingly, the district court correctly entered summary judgment for the defendants on the Medeiros substantive due process claim.

## C. **The Tenth Amendment Claim**

Finally, Medeiros maintains that he alleged a viable

Tenth Amendment claim: that the Atlantic Coastal Act in general and in particular its provision permitting the Secretary of Commerce to impose a moratorium on any member State that refuses to adopt a "necessary" term of an IFMP constitutes an impermissible "commandeering" by the federal government of the states' legislative prerogatives. See, e.g., Printz v. United States, 521 U.S. 898, 924 (1997) (striking down Brady Act provision which required state law enforcement officers to assist in national instant background checks for firearm sales); New York v. United States, 505 U.S. 144, 168 (1992) (striking down provision requiring states to take title to radioactive waste as part of a federal regulatory initiative).[6] In other words, Medeiros intimates, the mere threat of a moratorium has compelled Rhode Island, against its will, to adopt the 100/500 limitation in Amendment 3.

The defendants counter that the instant claim must be dismissed on jurisdictional grounds since private citizens like Medeiros lack standing to assert Tenth Amendment claims, which are to be prosecuted (if at all) by the state. The defendants note as well that Rhode Island voluntarily has endorsed and continues to endorse the policy underlying the enactment of the 100/500 limit, see R.I. Gen. Laws § 20-8-7 (requiring that all state officials take any action necessary to comply with the ACFCMA compact), and

_____

[6]The Tenth Amendment provides: "The powers not delegated to the United States by the Constitution, nor prohibited to the States, are reserved to the States respectively, or to the people."

-17-

that even if the Atlantic Coastal Act or its moratorium were to be invalidated on Tenth Amendment grounds, Rhode Island voluntarily would elect to leave Regulation 15.18 in place, and therefore the harm incurred by Medeiros would not be redressed. In the alternative, the defendants contend that, even if Medeiros did have standing, the Atlantic Coastal Act does not constitute an impermissible "commandeering" of Rhode Island's legislative prerogatives, but rather a permissible "program of cooperative federalism" in which the federal and state governments have acted voluntarily in tandem to achieve a common policy objective. See New York, 505 U.S. at 167.

We resolve the threshold jurisdictional issue prior to reaching the merits of the Medeiros claim. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 101-02 (1998) (noting that court should not reach merits unless first assured that it has jurisdiction; to assume jurisdiction arguendo would result in an advisory opinion); Parella v. Ret. Bd. of the R.I. Employees' Ret. Sys., 173 F.3d 46, 53-54 (1st Cir. 1999). We conclude, as did the district court, that Medeiros lacks standing to present a Tenth Amendment claim.

The United States Supreme Court has held that private citizens lack standing to maintain Tenth Amendment claims. See Tenn. Elec. Power Co. v. Tenn. Valley Auth., 306 U.S. 118, 144 (1939) [hereinafter: "TVA"] ("As we have seen there is no objection

-18-

to the Authority's operations by the states, and, if this were not so, the appellants, absent the states or their officers, have no standing in this suit to raise any question under the amendment."). Medeiros incorrectly classifies the TVA holding as dictum. The Court dismissed the Tenth Amendment claim after analyzing both the standing issue and the merits, and hence, the former holding is an alternative ground, rather than obiter dictum. See California v. United States, 438 U.S. 645, 689 n.10 (1978); Woods v. Interstate Realty Co., 337 U.S. 535, 537 (1949); Natural Res. Def. Council, Inc. v. Nuclear Regulatory Comm'n, 216 F.3d 1180, 1189 (D.C. Cir. 2000). Accordingly, the Supreme Court's explicit holding in TVA, which has never been reversed, remains binding precedent.

Medeiros counters that the Supreme Court's subsequent discussion of the Tenth Amendment in New York v. United States, 505 U.S. 144 (1992), undermines TVA:

> The Constitution does not protect the sovereignty of States for the benefit of the States or state governments as abstract political entities, or even for the benefit of the public officials governing the States. To the contrary, the Constitution divides authority between federal and state governments for the protection of individuals. State sovereignty is not just an end in itself: "Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power."

Id. at 181 (citation omitted). Medeiros suggests that this language is to be read as abrogating the principle that only the states' interests are protected by the Tenth Amendment, and if

-19-

individual citizens also have interests, they must have standing in order to protect them in court.  We do not agree.

First, as the New York decision does not mention TVA, it cannot be construed as expressly overruling it.[7]  Moreover, even if the Medeiros reading of the passage were plausible and we were to conclude that its reasoning is inconsistent with TVA, we would remain bound to apply TVA.  "If a precedent of [the Supreme] Court has a direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions."  Rodriquez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477, 484 (1989).  The TVA decision has direct application to the instant case, in that it involved private parties attempting to assert Tenth Amendment claims, whereas New York did not.  Rather, since New York involved a claim asserted only by a state, the question of private-party standing under the Tenth Amendment was never at issue; indeed, the word "standing" was never mentioned.

Moreover, the Medeiros interpretation of New York – as holding that individuals must have standing to bring Tenth Amendment claims in court – is by no means inarguable.  The

---

[7]In fact, the Supreme Court has reiterated its TVA holding in subsequent dicta.  Flast v. Cohen, 392 U.S. 83, 105 (1968) (noting that private citizens cannot "assert the States' interest in their legislative prerogatives").

specific focus of the above-quoted discussion was whether a state could assert a Tenth Amendment "commandeering" claim where a previous administration of that state had initially acquiesced in the commandeering, or whether the Tenth Amendment claim had been waived. In responding that a state could never consent to an unconstitutional commandeering, the Supreme Court noted that the Amendment protects the individual citizens of the state generally by diffusing power among sovereigns, and therefore the State cannot waive a commandeering violation which in fact impinges upon that interest. New York, 505 U.S. at 182.

One might suppose that this proposition leads inevitably to the conclusion that, if a State refuses to oppose an unlawful commandeering, an individual citizen is the only remaining party with an interest and incentive to vindicate that violation, and therefore the New York Court necessarily must have envisioned that the private citizen would have standing to bring suit on the Tenth Amendment claim. While this is one plausible interpretation, it is not an inexorable one. Rather, the Court may simply have intended that the State represents the interests of its citizens in general, and, if it refuses to prosecute a viable Tenth Amendment claim, the citizens of that state may have recourse to local political processes to effect change in the state's policy of acquiescence. If the Tenth Amendment is not waivable, individuals could petition state officials for redress at any time. We need not determine

-21-

which interpretation is more likely, but only that it is at least debatable whether, or to what extent, the New York decision undermines the TVA holding.

Medeiros also notes that the Court recently granted a writ of certiorari for the purpose of deciding this very issue, see Pierce County, Washington v. Guillen, 537 U.S. 129 (2003), and though it ultimately declined to reach the question, id. at 148 n.10, we should interpret this development as an indication of the Court's readiness to overturn TVA. We can draw no such inference on the basis of this development. Certiorari could mean either that the Court is interested in reexamining and/or overruling TVA, or that it merely intends to reaffirm TVA in the face of a circuit split on the issue. Those circuit court decisions which have held that private citizens possess standing to bring Tenth Amendment claims are problematic. For instance, the Eleventh Circuit's precedent commenced without any reference to TVA, and subsequent panels have expressed concern as to whether the omission has resulted in the perpetuation of a circuit precedent inconsistent with TVA. See, e.g., Dillard v. Baldwin County Comm'rs, 225 F.3d 1271, 1283 & n.1 (11th Cir. 2000) (Barkett, J., concurring). In addition, the Seventh Circuit has permitted a state police officer to maintain a Tenth Amendment claim that a federal regulation interfered with the officer's state law enforcement job by prohibiting persons convicted of domestic violence crimes from

-22-

possessing guns, but in such specialized circumstances, it is debatable whether the plaintiff is acting in behalf of the state or simply as a private citizen. See Gillespie v. City of Indianapolis, 185 F.3d 693, 702-04 (7th Cir. 1999); cf. Lomont v. O'Neill, 285 F.3d 9, 13 n.3 (D.C. Cir. 2002) (noting in dicta that TVA likely would preclude Tenth Amendment standing to a purely private citizen, yet holding that a county sheriff and a chief of police possessed standing to assert a commandeering claim). In contrast, many courts explicitly have held that TVA, until overruled, bars Tenth Amendment claims by private citizens. See, e.g., United States v. Parker, 362 F.3d 1279, 1284-85 (10th Cir.), cert. denied, 125 S. Ct. 88 (2004); City of Roseville v. Norton, 219 F. Supp. 2d 130, 147-48 (D.D.C. 2002), aff'd, 348 F.3d 1020 (D.C. Cir. 2003), cert. denied sub nom. Citizens for Safer Cmtys., 541 U.S. 974 (2004); Vt. Assembly of Home Health Agencies v. Shalala, 18 F. Supp. 2d 355, 370-71 (D. Vt. 1998).

We are particularly reluctant to second-guess the continuing viability of TVA regarding so complex an issue of constitutional law. If and when the Supreme Court revisits TVA, it may be confronted with the question as to how a private citizen proceeds to establish a Tenth Amendment "commandeering" claim where the State itself has acquiesced in the federal-state arrangement. For example, if Medeiros were to possess standing, the question might arise as to whether he should be allowed discovery to

determine why Rhode Island officials initially adopted Regulation 15.18, or why those officials reinstated the regulation with dispatch following its brief repeal in 2000. On the other hand, if the State cannot acquiesce in a commandeering regime, see New York, 505 U.S. at 182, its actual motivation in enacting Regulation 15.18 might be immaterial. Finally, if private citizens possess standing to prosecute Tenth Amendment claims, it is not difficult to envision a substantial increase in such litigation before the federal courts. Given that potential, the prudential and precedential principle enunciated in Rodriquez de Quijas seems particularly apt. In the event TVA is no longer good law, it should be for the Supreme Court explicitly to overrule it.

Accordingly, we affirm the district court holding that Medeiros lacks standing to pursue a Tenth Amendment claim that the Atlantic Coastal Act constitutes an unconstitutional commandeering of the Rhode Island legislative processes.

**Affirmed**.