Stephen C. MACKIE et al.

v.

STATE of Rhode Island et al.

No. 2006–63–M.P.

Supreme Court of Rhode Island.

Dec. 11, 2007.

Joseph S. Larisa, Jr., Providence, for plaintiff.

Terrence J. Tierney, for defendant.

Present: WILLIAMS, C.J.,
FLAHERTY, SUTTELL, and
ROBINSON, JJ.

**O P I N I O N**

Chief Justice WILLIAMS, for the Court.

In an effort to reduce the number of childhood lead poisonings in Rhode Island, the General Assembly enacted legislation intended to identify and correct lead hazards in this state. This legislation, the Lead Hazard Mitigation Act (LHMA), G.L. 1956 chapter 128.1 of title 42, has, nevertheless, sparked yet another controversy over lead paint.[1]

This case came before the Supreme Court for oral argument on November 5, 2007, pursuant to a petition for a writ of certiorari filed by defendants, the State of Rhode Island, Patrick Lynch, in his capacity as Attorney General of Rhode Island, David R. Gifford, M.D., M.P.H., in his capacity as director of the Rhode Island Department of Health, and Susan Baxter, in her capacity as chairwoman of the Rhode Island Housing Resources Commission (defendants or state). In their petition, defendants sought this Court's review of a Superior Court decision, in which a portion of the LHMA was declared unconstitutional, as being violative of the Equal Protection Clause of the Rhode Island Constitution. This Court granted defendants' petition, and for the reasons set forth herein, quashes the decision of the Superior Court.

**I**

**Facts and Travel**

**A**

**The Lead Hazard Mitigation Act**

In 2002 the General Assembly enacted the LHMA (P.L. 2002, ch. 187, § 3) and declared its purpose to be threefold. Section 42–128.1–3 provides that "[i]n order to promote the prevention of childhood lead poisoning in Rhode Island," the LHMA is intended

"(1) To increase the supply of rental housing in Rhode Island in which lead hazards are, at a minimum, mitigated;

"(2) To improve public awareness of lead issues and to educate both property owners and tenants about practices that can reduce the incidence of lead poisoning;

"(3) To resolve disjointed insurance practices arising from lead liabilities exclusions."

To that end, the LHMA imposes several duties on owners of rental dwellings constructed before 1978. These duties include: (1) attending a lead hazard awareness seminar; (2) evaluating the dwelling unit and premises for lead hazards; (3) correcting lead hazards by meeting the lead hazard mitigation standard; (4) providing tenants with information; and (5) correcting lead hazards within thirty days after notification. Section 42–128.1–8(a).

The LHMA originally provided that the lead hazard mitigation requirements would apply to the first change in ownership or tenancy after July 1, 2004; however, in 2004, that date was postponed to July 1,

---

1. An unrelated lead paint public nuisance action was the first to raise public awareness of the prevalence of childhood lead poisoning in Rhode Island and occasioned the longest civil jury trial in the state's history. *See State of Rhode Island v. Lead Industries Association, Inc.,* No. PC 99–5226, 2007 R.I.Super. Lexis

32 (R.I.Super.Feb. 26, 2007); *see also* Peter B. Lord, *Jurors in Lead–Paint Trial Say They're Proud of Verdict,* The Providence Journal, Mar. 12, 2006, at B1 (noting that "court officials believe [the lead paint trial] was the longest civil trial in state history").

2005, and in 2005, it again was postponed to November 1, 2005. *See* P.L. 2002, ch. 187, § 3; P.L. 2004, ch. 221, § 2; P.L. 2005, ch. 142, § 2. In 2005, the General Assembly also amended the act to include an exemption for certain property owners. P.L. 2005, ch. 142, § 2. The statute now in effect includes this exemption, which provides:

"(e) Notwithstanding the foregoing, the provisions of this chapter shall not apply to common areas in condominium complexes that are owned and operated by condominium associations, or to pre–1978 rental dwelling units that are:

"(1) Lead safe or lead free; or

"(2) Temporary housing; or

"(3) Elderly housing; or

"(4) Comprised of two (2) or three (3) units, one of which is occupied by the property owner; or [*sic*]

"The department of health shall report to the legislature annually on the number of children who are lead poisoned in any of the exempted dwelling units as referred to in subdivision (e)(4) of this section." Section 42–128.1–8(e).

At the center of this litigation is subsection (e)(4) of § 42–128.1–8, which exempts owner-occupied two- and three-unit dwellings from the act's mandates. The plaintiffs, owners of rental properties in various locations throughout the state, alleged that *this exemption results in different treatment for similarly situated property owners without regard to any lead hazard to children.* The plaintiffs asserted that the act is arbitrary in treating owner-occupied and non-owner-occupied dwellings of the same size differently and in treating owner-occupied two- and three-unit dwellings differently from owner-occupied four- or

five-unit dwellings. The plaintiffs' complaint sought both declaratory and injunctive relief. More specifically, it requested that the Superior Court declare the LHMA unconstitutional and enjoin the state from enforcing the act.

## B

### Evidentiary Phase of the Declaratory Judgment Hearing

A three-day hearing commenced in late 2005 in the Superior Court on plaintiffs' request for a declaratory judgment.[2]

The plaintiffs, to support their contention that the exemption found in the LHMA is arbitrary, relied on certain exhibits. The plaintiffs first submitted a letter from Dr. David R. Gifford, director of the Rhode Island Department of Health (DOH) to Representative Joseph A. Trillo, who served on the legislative commission that studied the LHMA in 2005. Accompanying the letter was a summary of data about childhood lead poisonings in 2004. According to this data, 175 children were significantly poisoned that year and, of those, 129 poisonings resulted in a property inspection. Of those 129 inspections, sixty-three were identified either as "owner-occupied" or "possibly owner-occupied" buildings and sixty-four involved non-owner-occupied buildings. There was insufficient data to categorize the remaining two properties.

The plaintiffs also introduced an affidavit from Eben Dowell, an urban information specialist, who studied the DOH blood lead testing records from 1998 to 2002 for children seventy-two months old or younger living in multifamily properties in Providence. In his affidavit, Dowell concluded that "the occurrence of

2. Although this hearing was originally scheduled to consider plaintiffs' motion for a preliminary injunction, the trial justice found it more appropriate to focus on plaintiffs' request for a declaratory judgment.

elevated blood levels was related to the rate of owner-occupancy." Dowell's study revealed that of the properties in which at least one child had been found with a blood lead level of at least ten micrograms per deciliter, 59 percent were not owner-occupied. This percentage increases, according to Dowell's study, with a larger number of children poisoned. For example, of the properties in which at least two children were poisoned, 63 percent were not owner-occupied, and of the properties in which at least three children were poisoned, 69 percent were not owner-occupied. Dowell's study also reported that the percentage of non-owner-occupied properties was higher for more severely poisoned children. For example, of the properties in which one child had been found with a blood lead level of at least twenty micrograms per deciliter, 63 percent were not owner-occupied. This percentage also increased with a larger number of children poisoned. Of the properties in which two children were poisoned, 69 percent were not owner-occupied and of the properties in which three children were poisoned, 71 percent were not owner-occupied.

The plaintiffs additionally submitted affidavits of Stephen Mackie and Joe Sousa, both of whom are plaintiffs in this action, saying that they were harmed by the LHMA's requirements as owners of rental properties in which they do not reside. Lastly, plaintiffs submitted printouts of the Housing Resource Commission website, which addressed frequently asked questions about the LHMA.

For their part, defendants countered plaintiffs' exhibits with a number of their own. The defendants first introduced the minutes of five meetings conducted by the Special Legislative Commission to Study the Lead Hazard Mitigation Law. The minutes included updates on the LHMA's implementation and recorded statements from a public meeting at which a number of individuals expressed their favor and disfavor with the law.

Additionally, in an effort to refute statistics set forth by plaintiffs, defendants offered as exhibits affidavits from a number of professionals who indicated that plaintiffs' complaint cited data that was based solely on the 129 cases of significantly lead-poisoned children and did not reflect the more accurate number of total childhood lead poisonings in 2004.

Susan Bodington, deputy director of programs for Rhode Island Housing and director of policy at the Rhode Island Housing and Mortgage Finance Corporation, said that 1,461 children entering kindergarten in Rhode Island in 2004 tested positive for elevated blood lead levels, far more than the figure provided in plaintiffs' complaint, which alleged that 129 children tested positive for lead poisoning in 2004. Bodington also explained that "[r]isks of poisonings are reduced in owner[-]occupied buildings because the owners is [sic] on the premises and can visually identify any lead hazards, is [sic] accessible to the tenants if they observe any lead hazards, and because it is in the owner's self interest to maintain a safe and healthy property for themselves and their family." Bodington offered further explanation for the need to differentiate buildings based on the number of units. She noted that rental dwellings in structures with four or more units typically are investment properties and that it was not uncommon to distinguish such properties from buildings with fewer units. She cited, for example, the state fire code, which confers additional requirements on owners of four-unit buildings. In Bodington's opinion, in buildings with more units, "there are increased potential health and safety risks to a greater number of tenants."

Daniela Quilliam, an epidemiologist at the DOH, also took issue with the number of childhood lead poisonings plaintiffs cited. According to Quilliam, a total of 1,685 children younger than age six tested positive for lead poisoning in Rhode Island in 2004. Of those, 1,167 were children who were newly poisoned in 2004.

The defendants also introduced into evidence an affidavit of Kimberly C. Booth, the president of a health-care consulting firm that provides services to the Lead Clinic at St. Joseph's Hospital. Booth stated that she examined 1,851 case records, of which 48 percent listed the owner's place of residence. Of the 893 properties for which records indicated the owner's address, ninety-five were single-family owner-occupied dwellings, which she excluded from her analysis. With respect to the remaining properties, she found that 62 percent were non-owner-occupied and 38 percent were owner-occupied. According to Booth, the data showed that home repairs required to abate lead hazards in owner-occupied dwellings were not as extensive as repairs required in absentee-owned property. Finally, Booth said that the data she examined revealed that there was a 10 percent higher rate of repeat poisonings for non-owner-occupied properties.

An affidavit of Liz Colon, an employee of the Childhood Lead Action Project, also criticized plaintiffs' statistics. Colon faulted plaintiffs for asserting that only 129 children were significantly poisoned in Rhode Island in 2004. Colon explained that such a figure represents only those incidences in which the DOH conducted inspections as part of interventions. Colon also referred to several studies that Brown University students conducted, one of which concluded that " 'occupants of dwellings * * * that are non-owner[-]occupied are at an increased risk for lead poisoning.' "

In addition to these exhibits, defendants also submitted various affidavits from people who believed the exemptions in the LHMA were reasonable. Kent Ackley, an environmental lead inspector in Rhode Island, said that there is "ample reason for the state to distinguish between [two-] and [three][-]family owner[-]occupied rental dwellings and those that are not owner[-]occupied." Ackley said that it was his professional opinion that "there exists a sound reason for the distinction between owner[-]occupied and non-owner-occupied [two-] and [three][-]unit rental dwellings because when the owner resides in the premises those properties generally receive more attentive maintenance." Ackley also provided justification for distinctions between two- and three-family owner-occupied rental dwellings and four or more family owner-occupied rental dwellings. Ackley explained that maintenance duties in properties with more units are more onerous to the property owner and require a skilled person to make the repairs. He also suggested that owners of four or more family properties have a greater rental revenue stream, thereby increasing property owners' ability to finance any required maintenance.

The defendants also presented an affidavit of Robert C. Tommasino, general counsel for the Rhode Island Joint Reinsurance Association. Tommasino said that the LHMA's exemptions are understandable and rational from a property and casualty insurer's perspective. He explained that property insurers often differentiate between commercial and personal residential risks when writing insurance policies based upon the number of units in a dwelling. However, he said that, in the insurance business, the line is drawn at more

than four units, rather than more than three, as is drawn in the LHMA. Tommasino also explained that the property insurance industry "has a significant history of claims demonstrating that owner[-]occupied dwellings are less likely to have general liability claims brought and sustained against them than non-owner[-]occupied dwellings."

The defendants also found beneficial the affidavit of Dowell submitted by plaintiffs; defendants relied on that same affidavit to support their position. In Dowell's study, he had concluded that "the occurrence of elevated blood lead levels was related to the rate of owner-occupancy."

June Tourangeau, a licensed practical nurse and a lead-care coordinator at the Lead Clinic at St. Joseph's Hospital, also submitted an affidavit on defendants' behalf. Tourangeau stated that, based on her experience in visiting the residences of hundreds of lead-poisoned children in Rhode Island, it was her professional opinion that "there are more repeated lead poisonings in homes that are not owner-occupied compared with those where the owner resides in the dwelling."

Finally, defendants offered an affidavit from Dr. Patricia A. Nolan, M.D., former director of the DOH, in which she outlined what she perceived as rational bases for differentiating between owner-occupied and non-owner-occupied units. According to Dr. Nolan

"[t]he rational basis for differentiating requirements for owner-occupied and non-owner-occupied units with respect to preventing and managing lead hazards include inspection and enforcement experience, the large number of young children living in non-owner-occupied units, and the experience gained from the application of similar standards to Section 8 housing units pursuant to the regulations of the U.S. Department of Health and Urban Development."

These nineteen documents were all admitted as full exhibits.

At the hearing on plaintiffs' request for a declaratory judgment, plaintiffs' counsel cross-examined Dr. Nolan about assertions in her affidavit. Doctor Nolan testified that the DOH's focus with respect to lead poisoning changed from secondary to primary prevention while she was director. Secondary prevention targeted the environment of children who already had tested positive for lead poisoning, while primary prevention sought to identify lead hazards before a child became poisoned and to encourage owners to make their properties safe. According to Dr. Nolan, the LHMA reflects the state's movement toward primary prevention.

Doctor Nolan testified that although the department did not have "studies per se," in the experience of their case managers and lead inspectors, owners who live on the premises tend to respond quicker to lead hazards. She also testified that the risk of lead poisonings increases in larger unit buildings, attributing that increase to the greater number of children living in such properties and the fact that it is more difficult to maintain such larger premises.

On January 10, 2006, the trial justice issued a decision declaring § 42–128.1–8(e)(4) unconstitutional, as being violative of the Equal Protection Clause of the Rhode Island Constitution. *Mackie v. State of Rhode Island*, No. PC 05–5144, 2006 WL 61053, 2006 R.I.Super. Lexis 3, at *26 (R.I.Super.Jan. 10, 2006). The trial justice found that there was "no rational basis for allowing the children who live in these two[-] and three-unit owner-occupied buildings to be at risk while children living in other units enjoy the protections of the Lead Hazard Mitigation Act." *Id.* at *9, 2006 R.I.Super. Lexis 3 at *25. He fur-

ther opined that "[t]he children in the owner-occupied two[-] and three-deckers cannot be left to the tender mercies of the building owners while children in other apartments enjoy the salubrious benefits of this remedial legislation." *Id.* Finally, the trial justice suggested that the statute was inequitable insofar as it imposed financial burdens on non-owner-occupied property owners. *Id.* at \*8–9, 2006 R.I.Super. Lexis 3 at \*25–26.

But although he ruled that the statute was unconstitutional, the trial justice concluded his written opinion by stating that the court would not enjoin the state from enforcing the statute. *Id.* at \*9, 2006 R.I.Super. Lexis 3 at \*26. Instead, he encouraged legislators to "promptly revisit the legislation and remedy the statute's constitutional defects." *Id.*

On January 30, 2006, the trial justice denied the state's motion for entry of final judgment pursuant to Rule 54(b) of the Superior Court rules of Civil Procedure. Thereafter, by order dated March 6, 2006, the trial justice denied the state's motion to stay the decision.

On March 14, 2006, the state petitioned this Court for a writ of certiorari, asserting three legal errors and contending that the trial justice's denial of its motion for entry of final judgment made appellate review unavailable through any other process. Accordingly, this Court granted the state's petition, as well as the petitions of *amici curiae* requesting permission to submit briefs concerning this important issue.

## II

### Analysis

The state raises three issues for this Court's certiorari review. First and most importantly, the state argues that the trial justice erred by concluding that § 42–128.1–8(e)(4) violates the Rhode Island Constitution. Second, the state contends that the trial justice improperly shifted to the state the burden of proving a rational basis for the challenged classification. Finally, the state takes issue with the trial justice's failure to enter a final judgment pursuant to Rule 54(b), after having ruled that § 42–128.1–8(e)(4) violates the Rhode Island Constitution.

### A

### Standard of Review

It is well settled that this Court presumes that legislative enactments are valid and constitutional. *Mosby v. Devine,* 851 A.2d 1031, 1045 (R.I.2004) (citing *City of Pawtucket v. Sundlun,* 662 A.2d 40, 45 (R.I.1995)). When reviewing a challenge to a statute's constitutionality, this Court exercises the "greatest possible caution." *Cherenzia v. Lynch,* 847 A.2d 818, 822 (R.I.2004) (quoting *Gorham v. Robinson,* 57 R.I. 1, 7, 186 A. 832, 837 (1936)). Unless the party challenging the statute's constitutionality can "prove beyond a reasonable doubt that the act violates a specific provision of the constitution or the United States Constitution, this Court will not hold the act unconstitutional." *Id.* (citing *Sundlun,* 662 A.2d at 44–45).

### B

### Equal Protection

The state's primary argument before this Court on certiorari review is that the trial justice erred by declaring that a provision of the LHMA violates the Rhode Island Constitution's guarantee of equal protection under the law. The plaintiffs, however, contend that the LHMA violates the Equal Protection Clause insofar as it discriminates against a class consisting of certain absentee landlords and owners of property with four or more units.

In the typical case, this Court is "quite reluctant to reach constitutional issues when there are adequate non-constitutional grounds upon which to base our rulings." *State v. Lead Industries Association, Inc.*, 898 A.2d 1234, 1239 (R.I.2006) (quoting *In re Court Order Dated October 22, 2003*, 886 A.2d 342, 350 n. 7 (R.I.2005)); *see also State v. Berberian*, 80 R.I. 444, 445, 98 A.2d 270, 270–71 (1953) (noting that "this [C]ourt will not decide a constitutional question raised on the record when it is clear that the case before it can be decided on another point and that the determination of such question is not indispensably necessary for the disposition of the case"). However, because this Court's resolution of the statute's constitutionality is indispensably necessary for the disposition of this case, we proceed with our analysis of the LHMA's constitutionality.

Rhode Island's Equal Protection Clause, article 1, section 2, of the Rhode Island Constitution, forms the basis of plaintiffs' primary claim. Like the corresponding federal guarantee in the Fourteenth Amendment to the United States Constitution, the Equal Protection Clause of the Rhode Island Constitution provides, in relevant part, that no person shall be "denied equal protection of the laws." R.I. Const. art. 1, sec. 2; *see also Rhode Island Insurers' Insolvency Fund v. Leviton Manufacturing Co.*, 716 A.2d 730, 734 (R.I. 1998) (holding that state and federal equal protection guarantees provide similar protections). Nevertheless, this protection "does not 'demand that a statute necessarily apply equally to all persons. * * * [Or] require [that] things which are different in fact * * * to be treated in law as though they were the same.'" *Kleczek v. Rhode Island Interscholastic League, Inc.*, 612 A.2d 734, 737 (R.I.1992) (quoting *Rinaldi v. Yeager*, 384 U.S. 305, 309, 86 S.Ct. 1497, 16 L.Ed.2d 577 (1966)). Indeed, this Court consistently has held that "the Legislature enjoys 'a wide scope of discretion in enacting laws that affect some classes of citizens differently from others.'" *Cherenzia*, 847 A.2d at 823 (quoting *Boucher v. Sayeed*, 459 A.2d 87, 91 (R.I.1983)). Therefore, not all legislative classifications are impermissible. *Id.* (citing *Kennedy v. State*, 654 A.2d 708, 712 (R.I.1995)).

Because the challenged statute does not impinge on a fundamental right, nor does it create a suspect classification, this Court will employ a rational basis test to determine whether it violates the Rhode Island Constitution. *See id.* at 823–25. "Under this analysis, if we can conceive of any reasonable basis to justify the classification, we will uphold the statute as constitutional." *Id.* at 825 (citing *Kennedy*, 654 A.2d at 712–13). In conducting such a review, this Court will not "delve into the Legislature's 'motives' for passing legislation." *Power v. City of Providence*, 582 A.2d 895, 903 (R.I.1990). We have held that "[e]ven if the Legislature had a constitutionally improper 'motive' when it passed legislation, the legislation would still hold up to rational basis scrutiny if this [C]ourt could find any legitimate objective." *Id.* (citing *In re Advisory Opinion to the House of Representatives*, 485 A.2d 550, 552 (R.I.1984)).

Furthermore, in conducting this review it is wholly irrelevant whether this Court can rationally conclude that the legislation would resolve a legitimate problem. Rather, the proper inquiry is whether the General Assembly rationally could conclude that the legislation would resolve a legitimate problem. *Power*, 582 A.2d at 902 (noting that the United States Supreme Court in *Weinberger v. Salfi*, 422 U.S. 749, 777, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975) has held that the proper inquiry in an action brought pursuant to the Equal Protection Clause of the United States

Constitution is "to determine whether Congress *could* rationally conclude that its legislation would effectuate a resolution to a legitimate problem"). Indeed, "the Equal Protection Clause is violated 'only if the [legislative] classification rests on grounds wholly irrelevant to the achievement of the State's objective. * * * A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it.'" *Id.* (quoting *McGowan v. Maryland,* 366 U.S. 420, 425–26, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961)).

 In accordance with these standards, a party "attacking the rationality of [a] legislative classification [has] the burden 'to negative *every* conceivable basis which might support it.'" *Medeiros v. Vincent,* 431 F.3d 25, 32 (1st Cir.2005) (quoting *Abdullah v. Commissioner of Ins.,* 84 F.3d 18, 20 (1st Cir.1996)); *see also Rhode Island Insurers' Insolvency Fund,* 716 A.2d at 733–34 (noting that the party challenging the constitutionality of a statute bears the burden of proving its unconstitutionality).

 Turning to the facts of this case, the exemption found in § 42–128.1–8(e)(4) treats differently the owners of two- and three-family properties who live in one of those units from owners who do not live at their rental property or who own rental property with four or more units. Nevertheless, we conclude that such a classification passes constitutional muster because the General Assembly rationally could have concluded that the legislation was one step toward resolving the problem of lead poisoning of children in Rhode Island.

 Both before the trial justice and now on appeal, the state has offered a plethora of reasons to support the current statutory scheme. Although it was not required to support those reasons with empirical evidence, *Medeiros,* 431 F.3d at

31, the state provided the trial court with the affidavits of numerous professionals, many of whom identified studies that revealed that owner-occupied properties were less likely to have incidents of childhood lead poisoning than non-owner-occupied properties. These professionals also provided justifications for distinctions made between two- and three-family properties and properties with four or more units.

After reviewing the evidence presented, the trial justice concluded that there was "no rational basis for allowing the children who live in these two[-] and three-unit owner-occupied buildings to be at risk while children living in other units enjoy the protections of the Lead Hazard Mitigation Act." *Mackie,* No. PC 05–5144, 2006 WL 61053 at *9, 2006 R.I.Super. Lexis 3, at *25. Such a statement, however, suggests that the trial justice found the statute to be unconstitutional because it did not protect all children living in rental properties. Although such a solution indeed would be laudable, the proper scope of the trial justice's review was not to consider whether a different solution would better protect children, but rather to decide whether the General Assembly had a rational basis to believe that its chosen solution would remedy a legitimate state problem.

After engaging in this inquiry, we are of the opinion that it would be perfectly rational for the General Assembly to have believed that owners who live on the premises are more likely to remedy lead hazards for their own safety and that of their families. Furthermore, legislators rationally could have concluded that owners who live on the premises are more accessible and are, therefore, more likely to be attentive to maintenance duties. Such a belief would be well founded, especially given that the evidence on the record reveals

that a higher number of childhood lead poisonings was reported in non-owner-occupied premises than owner-occupied premises. Additionally, the General Assembly rationally could have concluded that properties with four or more units are more difficult to maintain, therefore making it less likely that the owner, whether or not living on the premises, would keep up with such responsibilities. Finally, the General Assembly could have concluded that the number of children who potentially could be poisoned is greater in properties with four or more units simply given that such properties have the potential to house more residents.

▆ Admittedly, the current statutory scheme and its exemptions will not eradicate the state's childhood lead poisoning problem with one sweep of the legislative pen. But, we are persuaded that the General Assembly believed that targeting the areas where poisonings are most prevalent is one step toward achieving that end. The First Circuit has made it clear that "a statute or regulation is not lacking in a rational basis simply because it addresses a broader problem in small or incremental stages. * * * It is only necessary that there be some rational relation between the method chosen and the intended re-

sult." *Medeiros*, 431 F.3d at 31–32. We are cognizant that when enacting statutes with such far-reaching goals, the General Assembly must start somewhere.

▆ Because plaintiffs have failed to carry their heavy burden of negating every conceivable rational basis that might support the exception set forth in the statute, we conclude that the trial justice erred in ruling that the LHMA's exemptions were unconstitutional.[3]

Finally, this Court expresses its appreciation for the assistance of briefs submitted by *amici curiae*, which helped the Court prepare for oral argument and in its decision-making process.

### Conclusion

For the foregoing reasons we reverse the decision of the Superior Court and remand this case for entry of final judgment in accordance with this opinion.

Justice GOLDBERG did not participate.

---

**3.** Although the analysis set forth herein obviates the need for this Court to address the state's contention that the trial justice erred by not entering final judgment in this matter, we pause to note our concern with the trial justice's refusal to enter final judgment. This, coupled with the trial justice's refusal to restrain the implementation of legislation that he found unconstitutional, left the parties in legal limbo. The Rhode Island Constitution vests this Court with "final revisory and ap-

pellate jurisdiction upon all questions of law and equity." R.I. Const. art. 10, sec. 2. By refusing to enter final judgment, the trial justice, in effect, circumvented this Court's constitutionally vested jurisdiction by preventing an aggrieved party from appealing his decision to this Court. We cannot sanction such judicial action, which could burden litigants by requiring them to petition this Court for a writ of certiorari to obtain appellate review.