DECISION
Plaintiff labor unions[1] ("Plaintiffs") filed the underlying action against the Governor and General Treasurer of the State of Rhode Island, the Employees' Retirement *Page 2 
System of the State of Rhode Island ("ERSRI"), by and through the Rhode Island Retirement Board ("Retirement Board"), and the Chairman and Secretary of the Retirement Board (collectively "Defendants"), alleging that two recent legislative changes to the ERSRI violate the Contract Clause art. I, § 12, and the Takings Clause art. I, § 16, of the Rhode Island Constitution. Before the Court is Defendants' Motion for Summary Judgment pursuant to Super. R. Civ. P. 56, seeking a determination as to whether the ERSRI — a statutorily-created pension system for most state and some municipal employees — establishes a contractual relationship between the State of Rhode Island and participating employees. For the reasons stated herein, the Court denies Defendants' Motion for Summary Judgment and finds that the ERSRI does give rise to an implied contract and the rights and obligations incident thereto.
 I Facts and Travel
In 1936, the Rhode Island General Assembly statutorily created a retirement system, now known as the ERSRI, for the benefit of state employees, school teachers, and employees of participating municipalities. See P.L. 1936, ch. 2334, codified as G.L. 1956 §§ 36-8-1 to 36-10.1-4; see alsoNat'l Educ. Ass'n-R.I. v. Ret. Bd. of R.I. Emps.'Ret. Sys. ("NEA II"), 172 F.3d 22, 24 (1st Cir. 1999) (providing history of ERSRI); Kass v. Ret. Bd. of Emps.' Ret. Sys. of Stateof R.I., 567 A.2d 358, 362 (R.I. 1989) (same). Pursuant to the enabling legislation, the ERSRI was to be administered by the Retirement Board. See P.L. 1936, ch. 2334, codified as §§ 36-8-3, 36-8-4. *Page 3 
From its inception, the ERSRI has been a mandatory, contributory, defined benefit pension system. Under this system, the ERSRI deducts a statutorily-set percentage of participants' annual salaries from each of their paychecks.[2] In return, participants receive a fixed retirement allowance calculated based upon years of service and salary level achieved.See § 36-10-10 (allowance schedule for state employees); G.L. 1956 § 16-16-13 (allowance schedule for school teachers). The retirement allowance becomes due and payable to participants in equal monthly installments after retirement.See § 36-10-9 (retirement eligibility for state employees); § 16-16-12 (retirement eligibility for school teachers); § 36-10-9.2 (retirement eligibility for state correctional officers); § 36-10-9.3 (retirement eligibility for state registered nurses). Eligibility for retirement and collection of retirement allowance is based upon credited years of service and/or reaching certain statutorily-prescribed retirement ages.See, e.g., §§ 36-10-9, 36-10-9.2, 36-10-9.3; § 16-16-12.
In 2005, the General Assembly amended the ERSRI pension provisions affecting those employees with less than ten years of credited service as of July 1, 2005. See
P.L. 2005, ch. 117, art. 7, §§ 1, 2 (amending § 36-10-10, § 16-16-13). Specifically, the 2005 amendments increased the years of service requirements and decreased the affected employees' benefits by redefining the formula for calculating retirement allowances.See id. Until 2009, the General Assembly had passed no legislation aimed at decreasing the benefits afforded under the ERSRI to those employees with ten years or more of credited service.[3] Unaffected by the 2005 *Page 4 
amendments, those ten-year veterans continued to receive a fixed retirement allowance based on an unchanged formula of years of service — up to a maximum of eighty percent for thirty-five years of service — and salary level achieved — based on the average of the employee's three highest earning years. See id.
In 2009, the General Assembly passed P.L. 2009, ch. 68, art. 7 (the "2009 Act"). The 2009 Act altered, in a number of ways, the benefits available to those who already had accrued at least ten years of contributory service. First, the 2009 Act amended the provisions pertaining to retirement eligibility, in part by increasing the minimum age for retirement for those with ten years of service. See
P.L. 2009, ch. 68, art. 7 (amending §§ 36-10-9, 36-10-9.2,36-10-9.3; § 16-16-12). The relevant language, which is substantially similar in Titles 36 and 16 of the General Laws, provides as follows as to those employees with ten years of contributory service accrued on or before July 1, 2005:
 "For members who become eligible to retire on or after October 1, 2009, benefits are available to members who have attained the age of sixty-two (62) and completed at least ten (10) years of contributory service. For members in service as of October 1, 2009 who were not eligible to retire as of September 30, 2009, the minimum retirement age of sixty-two (62) will be adjusted downward in proportion to the amount of service the member has earned as of September 30, 2009. The proportional formula shall work as follows:
 (1) The formula shall determine the first age of retirement eligibility under the laws in effect on September 30, 2009 which shall then be subtracted from the minimum retirement age of sixty-two (62).
 (2) The formula shall then take the member's total service credit as of September 30, 2009 as the numerator and the *Page 5 
years of service credit determined under (1) as the denominator.
 (3) The fraction determined in (2) shall then be multiplied by the age difference determined in (1) to apply a reduction in years from age sixty-two (62)." Sec. 36-10-9(1)(a)(ii).
Prior to the 2009 Act, a state employee or school teacher with ten years of service accrued on or before July 1, 2005 was eligible to retire and collect a pension at the age of sixty or upon completing twenty-eight years of total service.See § 36-10-9(1)(a)(i); § 16-16-12(a)(1)(i).
As to those employees who had not accrued ten years of contributory service on or before July 1, 2005, the 2009 Act provides:
 "For members who become eligible to retire on or after October 1, 2009, benefits are available to members who have attained the age of sixty-two (62) and completed at least twenty-nine (29) years of total service or have attained the age of sixty-five (65) and completed at least ten (10) years of contributory service. For members in service as of October 1, 2009 who were not eligible to retire as of September 30, 2009, who have a minimum retirement age of sixty-two (62), the retirement age will be adjusted downward in proportion to the amount of service the member has earned as of September 30, 2009. The proportional formula shall work as follows:
 (1) The formula shall determine the first age of retirement eligibility under the laws in effect on September 30, 2009 which shall then be subtracted from the minimum retirement age of sixty-two (62).
 (2) The formula shall then take the member's total service credit as of September 30, 2009 as the numerator and the years of service credit determined under (1) as the denominator.
 (3) The fraction determined in (2) above shall then be multiplied by the age difference determined in (1) to apply a reduction in years from age sixty-two (62)." Sec. 36-10-9(1)(b)(ii).
Again, Title 16 includes comparable provisions for municipal school teachers. See §§ 16-16-12(a)(1)(ii), 16-16-12(b)(ii). Prior to the 2009 Act, a state employee or school teacher without at least ten years of contributory service as of July 1, 2005 was eligible to retire upon *Page 6 
completing twenty-nine years of service and attaining the age of fifty-nine or upon completing ten years of contributory service and attaining the age of sixty-five.See § 36-10-9(1)(b)(i); § 16-16-12(b)(i). An employee could also retire upon completing twenty years of service and attaining the age of fifty-five, but would receive a retirement allowance that was reduced actuarially for each month the employee was less than sixty-five years of age. See id.
Specifically with regard to correctional officers and registered nurses employed by the State, §§ 36-10-9.2 and 36-10-9.3 provide that for members in service but ineligible to retire as of September 30, 2009, retirement allowances are available upon completing twenty-five years of service and attaining the age of fifty-five, adjusted downward in proportion to the amount of service earned. See §§ 36-10-9.2(b)(ii), 36-10-9.3(b)(ii). Before the 2009 Act, these state employees were eligible to retire upon twenty-five years of service and attaining the age of 50.See §§ 36-10-9.2(b)(i), 36-10-9.3(b)(i).
In addition to amending the provisions pertaining to retirement eligibility, for those employees who had completed ten years of contributory service before July 1, 2005, the 2009 Act reduced the percentage allowances for any service completed on or after October 1, 2009. See
P.L. 2009, ch. 68, art. 7 (amending §§ 36-10-10, 16-16-13). For those employees who had not yet completed ten years of contributory service by July 1, 2005, the 2009 Act reduced the percentage allowances for all service completed, increased the number of years of service needed in order to receive the maximum retirement allowance from thirty-five to thirty-eight years, and reduced the maximum retirement allowance attainable from eighty percent to seventy-five percent.[4] See id. Finally, the 2009 Act altered the formula for arriving at the *Page 7 
salary level achieved, calculating salary based upon an employee's five highest consecutive earning years rather than three highest consecutive earning years. See id.
Since 1970, the ERSRI has also provided to retired members a cost of living retirement adjustment ("COLA") above and beyond the basic retirement allowance. See
P.L. 1970, ch. 112, art. X, §§ 1, 2 (amending § 36-10-35, § 16-16-40). Until 2010, an employee with ten years of credited service was eligible to receive a COLA equal to three percent of his or her original retirement allowance.See § 36-10-35(c); § 16-16-40(c). In enacting P.L. 2010, ch. 23, art. 16 (the "2010 Act"), the General Assembly decreased the COLA benefits available to employees who were not yet eligible to retire as of June 12, 2010, including those who had accrued ten or more years of contributory service. First, the 2010 Act eliminated the COLA for all retirement allowance benefits in excess of $35,000. See
P.L. 2010, ch. 23, art. 16 (amending § 36-10-35(d); § 16-16-40(d)). Second, the 2010 Act specified that the COLA would commence only upon the third anniversary of the date of retirement or upon the employee attaining the age of 65, whichever is later. Seeid. Finally, the 2010 Act limited the percentage increase for the COLA to the lesser of the Consumer Price Index for all Urban Consumers and three percent. See id.
On May 12, 2010, Plaintiffs filed suit on behalf of union members who participated in the ERSRI and had completed a minimum of ten years of credited service but were ineligible for retirement as of the dates on which the 2009 and 2010 Acts became effective. In their Amended Complaint, Plaintiffs seek a declaration from the Court that the 2009 Act and the 2010 Act are unconstitutional insofar as the Acts' provisions violate those union members' rights under the Contract Clause art. I, § 12, and the Takings Clause art. I, § 16, of the Rhode Island Constitution. Plaintiffs also seek injunctive relief. The parties stipulated that the sole *Page 8 
issue for decision by this Court on Defendants' Motion for Summary Judgment is whether the statutorily-created ERSRI pension plan establishes a contractual relationship between the State of Rhode Island and ERSRI participants for purposes of the Contract and Takings Clauses of the Rhode Island Constitution.
 II Standard of Review
"Summary judgment is appropriate if it is apparent that no material issues of fact exist and the moving party is entitled to judgment as a matter of law." Chavers v. Fleet Bank (R.I.),N.A., 844 A.2d 666, 669 (R.I. 2004). Consistent with the parties' stipulation, no genuine issues of material fact are in dispute. The issue before the Court is a pure question of law.
Moreover, this Court's analysis is "guided by `the principle that legislative enactments enjoy a presumption of validity and constitutionality.'" In re Advisory Opinion to the Governor(Casino), 856 A.2d 320, 327 (R.I. 2004) (citing Mosby v.Devine, 851 A.2d 1031, 1045-46 (R.I. 2004)). "When reviewing a challenge to a statute's constitutionality, [the] Court exercises the `greatest possible caution.'" Mackie v. State,936 A.2d 588, 595 (R.I. 2007) (quoting Cherenzia v. Lynch,847 A.2d 818, 822 (R.I. 2004)). In keeping with its exercise of extreme caution, our Supreme Court has long held "[t]he act must stand as valid, unless we are convinced beyond a reasonable doubt that it is contrary to a provision which is either expressly set forth in the State Constitution, or must, beyond a reasonable doubt, be necessarily implied from language expressly set forth therein."Gorham v. Robinson, 57 R.I. 1, 10, 186 A. 832, 838 (1936). This Court is mindful that "[w]hen the fundamental law has not limited, either in terms or by necessary implication, the general powers conferred upon the legislature, [it] cannot declare a limitation under the notion of having discovered something in thespirit of the *Page 9 
constitution which is not even mentioned in the instrument."Id. at 9, 186 A. at 838 (emphasis in original) (citation omitted).
Defendants place great emphasis on the "beyond a reasonable doubt" standard. Because this is neither an evidentiary nor a criminal matter, but rather a Motion for Summary Judgment on a pure question of law, the Court need not apply the evidentiary standard "beyond a reasonable doubt" used in criminal matters. Furthermore, our Supreme Court has, in the context of constitutional challenges to state enactments, declined to apply the "beyond a reasonable doubt" standard in the traditional, evidentiary manner.See, e.g., Casino, 856 A.2d at 327-29 (deciding card and dice games are "games of chance" as a matter of law and are thus constitutionally-prohibited "lotteries" despite recognizing "a certain level of fact-finding would be helpful to determine the exact role that skill or judgment play"). The parties may be assured, nevertheless, that the Court will apply the presumption of constitutionality and "in the performance of so solemn a duty `will approach the question with great caution, examine it in every possible aspect, and ponder upon it as long as deliberation and patient attention can throw any new light on the subject. . . .'"Gorham, 57 R.I. at 7, 186 A. at 837 (quoting In reWellington, 16 Pick. 87, 95 (Mass. 1834)). To the extent that the "beyond a reasonable doubt" standard serves to emphasize the import of exercising judicial restraint, this Court is mindful.
 III Analysis
It is important to emphasize that this Court is asked to limit its decision to the stipulated issue: whether a contract exists between Plaintiffs and the State. Accordingly, the Court's inquiry addresses only one element in contract clause analysis. *Page 10 
Plaintiffs base their first constitutional challenge to the 2009 and 2010 Acts on the Contract Clause of the Rhode Island Constitution. Like its federal counterpart, that provision prohibits laws impairing the obligation of contracts. Article I, § 12 of the Rhode Island Constitution states: "No ex post facto law, or law impairing the obligation of contracts, shall be passed."Article I, § 10 of the United States Constitution provides that "[n]o State shall . . . pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts."
The Contract Clauses of the Rhode Island Constitution and the United States Constitution limit the power of the State "to modify its own contracts and to regulate private contracts."Brennan v. Kirby, 529 A.2d 633, 638 (R.I. 1987) (citingU.S. Trust Co. of N.Y. v. New Jersey, 431 U.S. 1 (1977)). This prohibition is not absolute. Id. (citing HomeBldg. Loan Ass'n v. Blaisdell, 290 U.S. 398, 428 (1934)). A statute that modifies a public contract will "pass constitutional muster under contract clause analysis so long as it is reasonable and necessary to carry out a legitimate public purpose."Id. (citing U.S. Trust Co. of N.Y., 431 U.S. at 25-26).
The Rhode Island Supreme Court has used the United States Supreme Court's three-prong analysis for deciding whether a state law unconstitutionally impairs the obligation of contracts as set forth in Energy Reserves Group, Inc. v. Kansas Power Light Co.,459 U.S. 400, 411-12 (1983). See R.I. DepositorsEcon. Prot. Corp. v. Brown, 659 A.2d 95, 106 (R.I. 1995). This three prong analysis requires a court to determine
 "[f]irst, has the state law in fact substantially impaired a contractual relationship? Second, if the law constitutes a substantial impairment, can the state show a legitimate public purpose behind the regulation, `such as the remedying of a broad and general social or economic problem'? Third, is the legitimate public purpose sufficient to justify the impairment of the contractual rights?" Id. (citing Energy Reserves Group, 459 U.S. at 411-2). *Page 11 
When addressing the first prong of this three-prong analysis, a court must ask: whether a contract exists; whether the law impairs a right or obligation under the contract; and whether the impairment is substantial. See Retired Adjunct Professors of Stateof R.I. v. Almond, 690 A.2d 1342, 1345 n. 2 (R.I. 1997) (citingBrown, 659 A.2d at 106); see also General MotorsCorp. v. Romein, 503 U.S. 181, 186 (1992). With respect to the first prong — whether a state law has in fact substantially impaired a contractual relationship — this Court will here conduct the threshold inquiry of whether there exists a contractual relationship, the precise issue now before this Court.
In determining whether a statutory enactment creates contractual obligations, or in other words, whether a contract exists, the Court must first examine the statute's language and the circumstances surrounding it. See Retired Adjunct Professors,690 A.2d at 1345. If no contract exists, the contract and takings clause inquiry ends. Conversely, if the Court determines that a contract exists and the law in question has been substantially impaired by the challenged enactment, it must then complete the three-prong analysis as set forth in Energy Reserves Group,459 U.S. at 411-12, and inquire as to the presence of a legitimate public purpose sufficient to justify the impairment. SeeBrown, 659 A.2d at 106. Even if the Court finds substantial impairment of a contract, it may still conclude that the enactment "pass[es] constitutional muster under contract clause analysis so long as it is reasonable and necessary to carry out a legitimate public purpose." Brennan, 529 A.2d at 638 (citing U.S.Trust Co. of N.Y., 431 U.S. at 25-26).
In the larger context of determining whether the 2009 and 2010 Acts unconstitutionally impair the obligation of contracts, this Court's assessment of whether the ERSRI pension plan *Page 12 
establishes a contractual relationship between the State and ERSRI participants is paramount. The inquiry into whether a contract exists is the cornerstone of contract clause analysis.
The existence of a contract and the rights incident thereto are also foundational in the context of Plaintiffs' second constitutional challenge. Plaintiffs contend that the 2009 and 2010 Acts violate the Takings Clause of the Rhode Island Constitution, which provides, much like its federal counterpart, that "[p]rivate property shall not be taken for public uses, without just compensation." Compare
R.I. Const. art. I, § 16, with U.S. Const. amend. V ("nor shall private property be taken for public use, without just compensation [ ]"). An individual's contract rights constitute private property for purposes of the Takings Clause. SeeParella v. Ret. Bd. of R.I. Emps.' Ret. Sys.,173 F.3d 46, 59 (1st Cir. 1999) ("Only if we determine that plaintiffs had a constitutionally protected contract right to the excess benefits can we consider whether the state took that contract right without just compensation."); see also NEAII, 172 F.3d at 30 (noting that, if plaintiffs had a contractual right to future payments, such right would be property under the Takings Clause). Plaintiffs' takings clause claim is undisputedly based upon the existence and deprivation of rights in contract; therefore, the Court's decision today bears equally upon both of Plaintiffs' claims.
 A The Historical and National Landscape of PublicPensions
In determining whether a contract exists between Plaintiffs and the State, it is necessary to understand the evolution of public pension law, as well as present national trends relating to this issue. Public pension plans historically were viewed as gratuities and not contracts. McGrath v. R.I. Ret. Bd.,88 F.3d 12, 16 (1st Cir. 1996) (citing Pennie v. Reis,132 U.S. 464, 471 (1889)). During the late eighteenth century, the generally accepted rule was that a pension *Page 13 
was "a gratuity of the state, `a bounty springing from the appreciation and graciousness of the sovereign. . . .'" In reAlmeida, 611 A.2d 1375, 1385 (R.I. 1992) (quotingBallurio v. Castellini, 102 A.2d 662, 666 (N.J. Super. 1954)). As such, "a pension granted by the public authorities [was] not a contractual obligation, but a gratuitous allowance, in the continuance of which the pensioner has no vested right. . . ." Annot., Vested Right of Pensioner to Pension, 54 A.L.R. 943, 943 (1928). The gratuity approach was developed from the sovereign's perspective.Nat'l Educ. Ass'n-R.I. v. Ret. Bd. of R.I. Emps.' Ret. Sys. ("NEAI"), 890 F. Supp. 1143, 1153 (D.R.I. 1995).
In 1904, the tide shifted when the New Jersey Supreme Court held that an amendment to a public school teachers' retirement plan gave rise to a contractual relationship. See Ball v. Bd. of Trs. ofTeachers' Ret. Fund, 58 A. 111, 111-12 (N.J. 1904). In its formative years, this "contract approach" was applied exclusively to pension systems featuring voluntary participation. See Pierce v.State, 910 P.2d 288, 297 (N.M. 1995) (detailing early use of voluntary/mandatory distinction). "Voluntary plans were deemed to create vested rights while compulsory participation meant no vested interest accrued." Pineman v. Oechslin,488 A.2d 803, 808 (Conn. 1985) (citing Annot., Vested Right ofPensioner to Pension, 52 A.L.R.2d 437, 441-43 (1957)). The contract approach was "developed from the perspective of state employees. It preserves the expectations of employees who make career decisions, retirement savings, and life plans in relation to the receipt of state pensions." NEA I, 890 F. Supp. at 1154.
Today, a majority of states recognize that public pensions give rise to contractual obligations. See Terry A.M. Mumford Mary Leto Pareja, The Employer's (In)ability To ReduceRetirement Benefits in the Public Sector, in
SC14 A.L.I.-ABA, Course of Study *Page 14 Materials, Employee Retirement Welfare Plans ofTax-exempt Governmental Employers 27, 39 (1997). Over the past century, a number of states have passed constitutional amendments protecting the contractual right of public employees to their pensions in varying degrees. See, e.g., Alaska Const. art. XII, § 7; Haw. Const. art. XVI, § 2; Ill. Const. art. XIII, § 5; La.Const. art. X, § 29; Mich. Const. art. IX, § 24; N.Y. Const. art. V, § 7. At least one other state has included a similar express provision in its retirement statute. See
Mass. Gen. Laws ch. 32, § 25(5) (2009). Rhode Island, however, has no such provision.
Among those states without clear constitutional or statutory provisions, a growing number have adopted the view that public employees possess implied-in-fact contractual rights to their statutorily-created pensions. See McGrath, 88 F.3d at 16-17. In adopting this view, courts "recognize[] that the promise of a pension is part of the compensation package that employers dangle to attract and retain qualified employees." Id. "In line with this evolving doctrine [courts] have held that, in general, pensions are to be regarded as a species of unilateral contracts."Id. at 17 (citing Hoefel v. Atlas Tack Corp.,581 F.2d 1, 4-5 (1st Cir. 1978)).
Although in agreement that the gratuity approach is outmoded, state courts are not in agreement as to when they consider a contract to be formed, thereby triggering contract and takings clause protections. Nor are state courts in agreement as to what changes, if any, legislatures can make to public pension plans after employment commences. See Singer v. City of Topeka,607 P.2d 467, 474 (Kan. 1980) (discussing various approaches). Many jurisdictions discuss the realization of contract rights in terms of "vesting." In other words, the amount of protection afforded public employees varies depending on when the employees "vest" in the contract. *Page 15 
At one end of the spectrum is the theory that an employee's contract rights absolutely vest as soon as employment commences.See, e.g., Yeazell v. Copins,402 P.2d 541, 545 (Ariz. 1965) (holding rights vest upon employment acceptance and cannot thereafter be altered without mutual assent). In arriving at this strict contract theory, the Arizona Supreme Court reasoned:
 "[P]ublic employment seldom pays on the same scale as private enterprise for the same services. The consideration of promised retirement is in private industry a major inducement both for the entrance into by superior personnel and their continuation in employment and avoidance of the expense of labor turnover. Government, with its various public agencies, enters into areas on a scale so vast and to such an extent as to have scarcely been conceived fifty years ago. To the end that the public service may be improved, the legislature has authorized the state and its various subdivisions to establish retirement and pension plans. These plans are not dependent upon the benevolence of the employing agency but are prescribed by the legislature and the conditions of the employment, as related to retirement from public service, are provided by general law. Retirement is, as in private industry, a valuable part of the consideration for the entrance into and continuation in public employment." Yeazell, 402 P.2d at 545 (internal citations omitted).
At the other end of the spectrum is the theory that contract rights vest only upon retirement or eligibility for retirement.See, e.g., Fla. Sheriffs Ass'n v. Dep't of Admin.,408 So. 2d 1033, 1036 (Fla. 1981); City of Louisville v. Bd. ofEduc. of Louisville, 163 S.W.2d 23, 25 (Ky. 1942);Atchison v. Ret. Bd. of Police Ret. Sys. of Kansas City,343 S.W.2d 25, 34 (Mo. 1961); Baker v. Okla. FirefightersPension Ret. Sys., 718 P.2d 348, 353 (Okla. 1986);Tait v. Freeman, 57 N.W.2d 520, 522 (S.D. 1953). The Supreme Court of Oklahoma explained its rationale as follows:
 "Viewing the contract between the state and its employees as coming into existence at the point of eligibility allows the necessary flexibility in fiscal planning which must be given the Legislature. This view also avoids the necessity of engaging in the *Page 16 
tortuous applications of contract law which other jurisdictions have applied in finding that rights, which they have characterized as being in existence, remain subject to unilateral modifications. This view also realistically acknowledges the contingent nature of the relationship as it ripens into a contractual obligation on the part of the state." Baker, 718 P.2d at 352.
This much more conservative approach embraces a "contract theory" in name only. It has been described as little more than a thinly veiled characterization of pensions as gratuities.[5] SeeHammond v. Hoffbeck, 627 P.2d 1052, 1056 (Alaska 1981). Between the poles of "contract theory" rest those jurisdictions finding that vesting occurs upon commencement of participation in the pension plan, after fulfillment of the service requirement only, or at other points along the spectrum. See, e.g.,Betts v. Bd. of Admin. of Pub. Emps.' Ret. Sys.,582 P.2d 614, 617 (Cal. 1978) (finding limited vesting rights upon employment acceptance, which may be reasonably modified before retirement to maintain flexibility and accommodate changing conditions); State ex rel. State Bd. of PensionTrs. v. Dineen, 409 A.2d 1256, 1259 (Del. Ch. 1979) (holding contract rights vest upon completion of statutorily prescribed ten-year service requirement even though employee must wait until retirement age to collect); Singer, 607 P.2d at 474 (finding public pension-based contract rights vest upon "[c]ontinued employment over a reasonable period of time during which substantial services are furnished to the employer, plan membership is maintained, and regular contributions into the fund are made");Pub. Emps.' Ret. Bd. v. Washoe Cnty.,615 P.2d 972, 974 (Nev. 1980) *Page 17 
(concluding that, in "rendering services and making contributions, an employee acquires a limited vested right to pension benefits");Burlington Fire Fighters' Ass'n v. City of Burlington,543 A.2d 686, 689 (Vt. 1988) (noting "where an employee makes mandatory contributions to a pension plan, that pension plan becomes part of the employment contract as a form of deferred compensation, the right to which is vested upon the employee's making a contribution"); Leonard v. City of Seattle,503 P.2d 741, 747-48 (Wash. 1972) (reasoning that pension rights vest "day to day" and "year to year" giving rise to a property right which vests completely upon retirement).
Although "gratuity versus contract" analysis has dominated judicial decisions since the early twentieth century, a number of states have used other rationales in determining pension rights. The Minnesota Supreme Court, for example, found that the state retirement system did not give rise to a contract per se and that the gratuity approach was antiquated. See Christensen v.Minneapolis Mun. Emps. Ret. Bd.,331 N.W.2d 740, 747 (Minn. 1983). That court applied the doctrine of promissory estoppel in assessing the constitutionality of certain pension reforms. Id. The Minnesota court reasoned: "In the realities of the modern employment marketplace, the state reasonably expects its promise of a retirement program to induce persons to accept and remain in public employment, and persons are so induced, and injustice can be avoided only by enforcement of that promise."Id. at 749.
In a complete deviation from the "gratuity versus contract" discussion, the Connecticut Supreme Court determined that its state pension plan created property rights and not contract rights.See Pineman, 488 A.2d at 810. These property rights were protected from arbitrary legislative action under the Due Process Clause. Id. The Pineman court explained:
 "Unlike the gratuity concept, the due process approach protects public employees from legislative confiscation of the retirement *Page 18 
fund and arbitrary forfeiture of pension benefits. At the same time, a due process analysis provides the necessary flexibility that the contract approach lacks and avoids the strain on settled principles of contract law, statutory interpretation and contract clause jurisprudence that the [contract theory] entails." Id.
Several states have also discerned property rights incident to public pensions. See, e.g., Spiller v. State,627 A.2d 513, 517 n. 12 (Me. 1993) (citing favorably toPineman); Pierce, 910 P.2d at 301-02 (opining that public pensions create property — not contract — interest upon vesting, which matures upon fulfilling all retirement conditions).
 B The Rhode Island Supreme Court's Rulings
In Rhode Island, the issue of whether state employees with at least ten years of contributory service possess contractual rights to their retirement allowances and COLA benefits under the ERSRI is one of first impression. The Rhode Island Supreme Court has described a pension as comprising elements of contract and deferred compensation, but it has never answered the specific question before this Court. See Almeida,611 A.2d at 1385 (discussing nature of state pensions). Notwithstanding, the Court is guided by the following chronological review of our Supreme Court's opinions in this area of the law.
In 1987, our Supreme Court considered the constitutionality of the Rhode Island General Assembly's repeal of a statute providing seniority rights in public employment to those who completed military service. See Brennan, 529 A.2d at 636, 638-39. The plaintiffs, a group of working and retired firefighters and police officers, challenged the repeal as violative of the Contract and Takings Clauses of both the Rhode Island and United States Constitutions. Id. at 635-36. In finding that no contract arose from the military seniority rights statute, the Court reasoned: *Page 19 
 "The [U.S.] Supreme Court has steadfastly adhered to the principle that absent a clear indication by the Legislature that it intended to bind itself contractually by passing an enactment, the presumption pervades that `[the] law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise.'" Id. at 638 (quoting Dodge v. Bd. of Educ. of Chicago, 302 U.S. 74, 79 (1937)).
The Brennan Court began and ended its analysis by looking to the language of the statute itself, noting that "[i]f the language of the statute provides for the execution of a written contract on behalf of the state then clearly a binding obligation is created. . . ." Id. at 639. Finding no such provision in the statute at issue, the Court declined to find a contract.Id.
Several years later, our Supreme Court had occasion to discuss the nature of a state pension. See Almeida, 611 A.2d at 1385-87. In Almeida, the Court considered whether a retired judge removed for disciplinary reasons could lose his state pension.[6]Id. at 1377. In its analysis, the Court reviewed the many theories espoused by other jurisdictions concerning pensions and vesting of pension rights. Id. at 1385-87. The Court explicitly rejected the notion that a pension is a gratuity of the State, even if noncontributory. Id. at 1385. Although hesitant to expressly categorize pensions as contracts, the Court nevertheless concluded "that a pension comprises elements of both the deferred compensation and the contract theories."Id. at 1386. Under the contract theory, the Court explained, a "pension is completely vested once the employment contract is signed and employment begins," and if the plan is contributory, "the contractual obligations are formed when the conditions of employment are satisfied." Id. at 1385 (internal citations omitted). Pensions, being part of a compensation package, also comprise elements of deferred compensation. Almeida, 611 A.2d at 1386. Under the deferred compensation theory, a pension vests "when the employee completes the years of eligibility," *Page 20 
and "[c]ontract rights may attach upon entering public employment and service." Id. at 1385. Looking solely to the issue of pension vesting and not to the realization of contract rights, the Court noted "[t]he right to deferred compensation vests upon meeting the terms of employment, but that vesting is subject to divestment because it is conditioned on continued honorable and faithful service." Id. at 1386. The Court ultimately held that the plaintiff was not entitled to retain his pension benefits because such deferred compensation benefits are of the same character as non-deferred compensation and "[a] judge who is otherwise entitled to salary may not receive it when he has acted improperly and been charged with a crime." Id. at 1388-89. Notably, theAlmeida Court did not analyze whether the pension statute at issue gave rise to a contractual relationship for purposes of contract or takings clause analysis.
In the case of Retired Adjunct Professors, the constitutionality of an amendment to the ERSRI itself finally came before our Supreme Court. 690 A.2d at 1344. There, the challenged amendment precluded state reemployment for retired professors from state colleges "unless any and all retirement benefits to which [they] may be entitled . . . are suspended for the duration of any such employment or reemployment." Id.
(quoting P.L. 1994, ch. 142, § 1). Before the amendment, the statute allowed retired professors to be reemployed by the State for up to seventy-five full days or 150 half days before suspending pension payments. Id. The lower court found that the statutory reemployment provisions as they existed at the time of the plaintiffs' retirement could not be altered retroactively because they gave rise to contractual rights protected under the state and federal contract clauses. Id. at 1344-45. In so finding, the lower court relied upon the U.S. District Court for the District of Rhode Island's analysis in NEA I, wherein the Federal District Court held in part that legislation creating an option for certain union members to join the ERSRI likewise created a contractual relationship. Retired Adjunct Professors, 690 A.2d at 1347. *Page 21 
On appeal, the Rhode Island Supreme Court held that a statute creates contractual rights "only when the language and the circumstances of the statute's enactment evince a clear legislative intent to create private and enforceable contract rights against the state." Id. at 1345. Specifically, the Court challenged the lower court's reliance on NEA I, distinguishing the circumstances before it on multiple fronts:
 "First, unlike the plaintiffs in the NEA [I] case, these plaintiffs gave no specific, bargained-for consideration in exchange for the opportunity to be offered a certain number of post-retirement work hours from the State. Because they were not guaranteed this opportunity in the first place, they are not being deprived of any negotiated or promised consideration when the Legislature decides to repeal or to modify this benefit. Second, plaintiffs here are suing to enforce their mere expectation of receiving future reemployment opportunities; they have not been denied any previously offered reemployment, nor are they being asked to forfeit any payments due them for work they have already performed." Id.
By the Retired Adjunct Professors Court's reasoning, in the absence of the "`bargained-for-exchange' that is the hallmark of contracts" or of any language in the statute granting or referring to contractual rights to post-retirement public employment, the "plaintiffs' asserted reliance on the then-existing reemployment-hours cap . . . should not [have] be[en] allowed to convert legislative policy into guaranteed or implied contract rights."[7] Id. at 1346.
Retired Adjunct Professors did not, however, mark the end of Rhode Island state courts' reliance on NEA I. SeePellegrino v. R.I. Ethics Comm'n,788 A.2d 1119, 1125 (R.I. 2002). In Pellegrino, our Supreme Court considered whether the Rhode Island Ethics Commission could invoke the doctrine of sovereign immunity to shield itself from former-commission officials' *Page 22 
declaratory judgment action seeking a declaration of their rights to payment for having attended commission meetings.Id. at 1120-21. The statute in effect when the plaintiffs attended the meetings had provided for compensation, but such compensation was later suspended by state enactment.Id. at 1121. The Pellegrino Court reasoned that in enacting a law that provided compensation to commission members in exchange for their services, the State was acting in a proprietary manner, "as a private employer would in arranging to compensate its employees." Id. at 1125. "[The State] laid aside its attributes as a sovereign and bound itself substantially as one of its citizens does when he [or she] enters into a contract."Id. (quoting Carr v. State ex rel. Du Coetlosquet,26 N.E. 778, 779 (Ind. 1891)) (citing Jolicoeur FurnitureCo. v. Baldelli, 653 A.2d 740, 755 (R.I. 1995)). In support of its finding of an implied waiver of sovereign immunity, the Court cited favorably to NEA I for the proposition that a statute extending benefits to state employees could create implied-in-fact contract rights. Id. at 1125. At the same time, thePellegrino Court deemed inapplicable "cases of this Court refusing to convert statutory benefits into enforceable contract rights that cannot be repealed legislatively without the state incurring liability to such claimants."Id. at 1126 n. 2 (citing D. Corso Excavating,Inc. v. Poulin, 747 A.2d 994 (R.I. 2000); Retired AdjunctProfessors, 690 A.2d 1342). The Court found that the "plaintiffs in the case at bar acquired a vested property right to receive the compensation when they attended commission meetings during the period when such compensation was due to them." Id.
Most recently, our Supreme Court had occasion to consider the nature of a COLA provided by city ordinance. See Arena v. City ofProvidence, 919 A.2d 379, 392-95 (R.I. 2007). The Arena
case arose when the City of Providence applied new, less generous COLA calculations to police and fire department employees who had retired before the effective dates *Page 23 
of the ordinances providing the new calculations.Id. at 384. The issue before the Arena Court was whether the plaintiffs had vested pension rights to receive COLA benefits provided by the ordinances in effect when they retired.Id. at 392. Initially, the Court engaged in a "gratuity versus contract" analysis, providing an overview of the multitude of approaches used in other jurisdictions to classify pension benefits.Id. at 392-93. The Court cited Almeida for the propositions that a pension is a mixture of contract and deferred compensation and that "pension benefits vest once an employee honorably and faithfully meets the applicable pension statute's requirements." Id. at 393. The specific ordinance in effect at the time of the plaintiffs' retirement provided in relevant part that "eligibility for a retirement allowance and the amount of such allowance shall be determined in accordance with the provisions of the ordinance to provide for the retirement of employees of the City of Providence as in effect on the last dayof a member's employment." Id.
(emphasis added by the Arena Court). Accordingly, theArena Court then considered whether a COLA was part and parcel of the "retirement allowance" such that it vested completely upon retirement. Arena, 919 A.2d at 393-95. The Court reviewed the ordinance in question and concluded that the COLA was a "living pension." Id. The Court explained that "a COLA is a vested pension benefit when a jurisdiction has adopted a mixed contract/deferred compensation theory of pension benefits."Id. (citing Shaw v. Int'l Ass'n ofMachinists Aerospace Workers Pension Plan,750 F.2d 1458, 1466 (9th Cir. 1985); Howell v. Anne ArundelCnty., 14 F. Supp. 2d 752, 754 (D. Md. 1998)). As a "living pension," a COLA is markedly different from "ancillary benefits such as medical coverage or early retirement." Id. (citingShaw, 750 F.2d at 1466). The Arena Court further noted that the five percent compounded COLA to which plaintiffs sought entitlement had been negotiated through the collective bargaining process. Id. at 395. In the end, based upon federal case law as well as *Page 24 
the language and circumstances of the ordinance, including the COLA's collective bargaining origins, the Court held "that the council did not have the authority to reduce plaintiffs' COLA benefit by subsequent ordinance because their right to receive the COLA provided by Ordinance 1991-5, which constitutes a vital part of their retirement allowance, vested upon their retirement."[8]Id.
Although the issue presented in this case is one of first impression, the foregoing cases provide a number of guiding principles. First, to determine whether a statute gives rise to a contractual relationship for purposes of contract clause analysis, the Court must look to the language of the statute and the circumstances of its enactment. See Retired AdjunctProfessors, 690 A.2d at 1345; see also Brennan,529 A.2d at 638-39. In keeping with its exercise of caution in addressing constitutional challenges to state enactments, the Court begins with the assumption that the ERSRI "merely declares a policy to be pursued until the legislature shall ordain otherwise."Brennan,529 A.2d at 638 (quoting Dodge, 302 U.S. at 79).
Second, a COLA and a pension are one and the same. SeeArena, 919 A.2d at 394 (citations omitted). Accordingly, this Court will apply the same analysis to both the 2009 and 2010 Acts.
Third, neither contributory nor non-contributory pensions are gratuities. See Almeida, 611 A.2d at 1385. Rhode Island is among the majority of jurisdictions recognizing that *Page 25 
"[m]edieval notions of the beneficence and graciousness of worldly monarchs have no relevance to modern notions of sovereignty."Pineman, 488 A.2d at 808 (citations omitted). The benefits provided pursuant to the ERSRI are not gratuities that may be taken away at the whim of the State.
Fourth, a vested pension benefit constitutes deferred compensation to be paid to the vested employee when the requirements of the pension statute are met, and the right to receive the pension is subject to divestment for the employee's failure to satisfy the terms of employment: long-term faithful service. SeeAlmeida, 611 A.2d at 1386; see also Arena, 919 A.2d at 395. Therefore, upon full vesting, and subject to honorable service, a pension cannot be altered or revoked. See generally Arena,919 A.2d 379; Almeida, 611 A.2d 1375; cf. Pellegrino,788 A.2d at 1126 n. 2 (citations omitted) (reasoning commission members had fully vested right to compensation that could not be denied by subsequent enactment).
Prior to retirement or retirement eligibility, the nature of a statutory pension benefit and the contractual relationships incident thereto, if any, remains a question in Rhode Island. Our Supreme Court has just once addressed whether contract rights may arise from the ERSRI for purposes of contract clause analysis. See RetiredAdjunct Professors, 690 A.2d at 1344-47. In Retired AdjunctProfessors, the Court was concerned with contractual rights solely to future public employment, not to the retirement allowances and COLA benefits at issue here. Nevertheless, Retired AdjunctProfessors does demonstrate the Court's reluctance to apply promissory estoppel in order to find quasi-contractual rights in a statutory pension scheme. Id. at 1346. Whether the Court is equally reluctant to apply other theories of limited vesting or implied unilateral contract has not been decided. In D.CorsoExcavating, the Court held that a workers' compensation reimbursement statute did not create a contractual relationship with *Page 26 
employers and workers' compensation insurers but created a mere expectancy. 747 A.2d at 1001 (quoting Retired AdjunctProfessors, 690 A.2d at 1346). However, in Pellegrino, the Court held that a statute extending stipends to certain employees created property rights. This case cited NEA I for the proposition that a statute extending pension benefits to employees "created [an] implied-in-fact contract which, when extinguished, violated [the] contract and takings clauses." Pellegrino,788 A.2d at 1125 (citing NEA I, 890 F. Supp. 2d at 1143).
Almeida provides some guidance with these two cases. There, the Court unequivocally described a pension as part-contract and part-deferred compensation. See Almeida, 611 A.2d at 1386. Although the Almeida Court did not conduct a contract clause analysis, it did, however, discuss when contractual rights and obligations arise under both the contract and deferred compensation theories. Under the contract theory, "contractual obligations are formed when the conditions of employment are satisfied."Id. at 1385. Under the deferred compensation theory, "[c]ontract rights may attach upon entering public employment and service." Id. Both theories recognize the existence of some kind of contractual relationship incident to pensions. Moreover, both theories demonstrate the difference between pension vesting and the realization of contractual rights and obligations. Seeid. at 1385-86 (discussing when pension rights vest as separate issue from when contract rights arise under contract and deferred compensation theories).
 C The First Circuit's Position
The parties rely on three cases in particular: NEA II,172 F.3d 22 (1st Cir. 1999); Parker v. Wakelin,123 F.3d 1 (1st Cir. 1997); R.I. Council 94 v. State,705 F. Supp. 2d 165 (D.R.I. 2010). The Court will address each of these cases, noting, however, that the issue of whether a *Page 27 
contract is formed for purposes of analysis under the Contract and Takings Clauses of the Rhode Island Constitution is a matter of Rhode Island state law. See Pierce, 910 P.2d at 299 (asserting state court is "final arbiter[]" of whether a state statute creates contractual relationship under state law (citing Pineman v.Oechslin, 637 F.2d 601, 604-05 (2d Cir. 1981))). Thus, these cases may be instructive, but they are not binding.
Beginning with Parker, it is clear that the First Circuit Court of Appeals adheres to what it calls the "unmistakability doctrine." 123 F.3d at 5 (citing McGrath, 88 F.3d at 19). Although our Supreme Court has not referred to the doctrine by name, it has adopted the reasoning of the U.S. Supreme Court that "absent a clear indication by the Legislature that it intended to bind itself contractually by passing an enactment, the presumption pervades that `[the] law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise.'"Brennan, 529 A.2d at 638 (quoting Dodge,302 U.S. at 79). In both federal and Rhode Island state cases applying this doctrine, courts consider the language and circumstances of the enactment prior to amendment or repeal.See U.S. Trust Co. of N.Y., 431 U.S. at 17 n. 14;Hoffman v. City of Warwick, 909 F.2d 608, 614 (1st Cir. 1990);Retired Adjunct Professors, 690 A.2d at 1345. InParker, the First Circuit applied the unmistakability doctrine to determine whether Maine's pension statute created contractual relationships with its members prior to actual retirement. Looking to the language of the statute, the Parker Court's analysis turned upon the following text, which is absent from the ERSRI: "[N]o amendment . . . may cause any reduction in the amount of benefits which would be due a member . . . on the date immediately preceding the effective date of the amendment."Parker, 123 F.3d at 8 (emphasis added). In particular, the court reasoned that the word "due" could easily be read to mean "currently payable," such that the legislature's intent could have *Page 28 
been to reserve to itself the power to alter pension benefits until the moment at which a member actually retires and has the right to demand payment. Id. With an equally vigilant eye to the text of the Maine pension statute, the Parker Court rejected the district court's decision to draw the line for the creation of contract rights at the time at which an employee completes his or her minimum service requirement. Id. In support of its holding, the district court referred to the completion of the minimum service requirement as the time of "vesting." On appeal, the First Circuit flatly refused to find that vested rights arose, if ever, at the time a member completed his or her years of service, reasoning that, unlike the ERSRI, "the term `vesting' does not figure in the statutory scheme itself, which simply indicates the age and service requirements that must be met." Id. at 3. Given the material differences between Maine and Rhode Island law,Parker's holding is confined to Maine's pension statute and is of limited assistance here.
The First Circuit did address the ERSRI itself in NEA II, albeit in a significantly different context. There, union employees who had joined the ERSRI pursuant to § 36-9-33, which was later repealed, challenged the constitutionality of the Eviction Act, § 36-9.1-1 et seq., under the Contract and Takings Clauses of the United States Constitution. NEA II,172 F.3d at 24-25. Section 36-9-33 had allowed employees of unions representing state employees to join the ERSRI and to purchase credit for a modest sum for all years previously served with the union. Id. at 24. Notably, the union employees were not employees of the State, and their compensation was not set by the State. Id. As a result, many highly-paid union officials almost immediately became eligible to receive state pensions well over their contributions to the ERSRI. Id. Due to public outcry, the section was repealed. In a later attempt to "evict" union employees from the ERSRI, the Legislature passed the Eviction Act, terminating those employees' state pensions.Id. at 25. In addressing the plaintiffs' constitutional challenge, the *Page 29 
court once again applied the unmistakability doctrine, stating, "[W]e do not think that the Rhode Island general pension statute `clearly and unequivocally' contracts for future benefits either by language or — in the circumstances of this case — through the nature of the relationship."Id. at 28 (emphasis in original). Looking first to language, the NEA II Court found that the annual appropriations guaranty in § 36-10-7 merely "directs state officials to fund the plan as it exists" and rejected the notion that the ERSRI's references to "vesting" created a contract. NEA II, 172 F.3d at 28. Turning to circumstances, the NEA II Court first considered the historical context of the ERSRI, noting that it was enacted in 1936 when pensions were largely considered mere gratuities.Id. Although the First Circuit did recognize that Almeida is potentially discordant, clearly holding that pensions are not gratuities, the court was dismissive, stating that "[i]n all events, whether a contract exists for [federal] Contract Clause purposes is a federal question." Id. Finally, and critically, the NEA II Court, as part of its analysis of the circumstances, considered the relationship between the plaintiff union employees and the State, reasoning "these particular plaintiffs do not have the benefit of a clear and longstanding employer-employee relationship with the government — they are far from the quintessential ten or twenty-eight years-of-service government employees." Id. at 29. The court held that no contractual relationship arose between the union employees and the State but "decline[d] to decide . . . whether this last consideration [i.e., the relationship between the plaintiffs and the state] would tip the balance if, for example, Rhode Island took a meat axe to the pensions of long-time state employees," like the Plaintiffs in the instant matter. Id.
Most recently, the U.S. District Court for the District of Rhode Island addressed inter alia whether a state employee who had worked for the state for eighteen years but was not yet eligible to retire enjoyed health benefits which had "`vested' into a unilateral contract" subject *Page 30 
to Contract and Takings Clause protections under the Rhode Island Constitution. R.I. Council 94, 705 F. Supp. 2d at 171, 179. Preliminarily, and in keeping with the First Circuit's adherence to the unmistakability doctrine, the Federal District Court explained that it must construe the intent of the Legislature from the statute's language as well as from the circumstances of the parties, which "by their nature, will vary from case to case. Particular plaintiffs bringing particular Contract Clause claims . . . may find themselves in markedly different circumstances."Id. at 178. The R.I. Council 94 Court reasoned that the plaintiffs there "continued to be governed by the give and take of the collective bargaining process" and, therefore, the bargained-for health benefits "do not forever lock-in at any particular point before retirement." Id. at 181. Plaintiffs here face "markedly different circumstances." Id. at 178. Plaintiffs challenge enactments affecting their retirement allowances and COLA benefits, items that, unlike health benefits, are not subject to the "vagaries of labor negotiations." Uricoli v. Bd. of Trs., Police andFiremen's Ret. Sys., 449 A.2d 1267, 1273 (N.J. 1982); seealso § 36-11-12. The Federal District Court itself recognized the distinction between health benefits and pension benefits, finding persuasive the notion that health benefits are, in fact, more like reemployment benefits which "may . . . be altered at any time."R.I. Council 94, 705 F. Supp. 2d at 179 (citing RetiredAdjunct Professors, 690 A.2d 1342).
 D Plaintiffs' Contractual Relationship with the State
The Defendants have argued that the unmistakability doctrine precludes a contractual relationship between the parties. The unmistakability doctrine invoked in the State's brief is a canon of contract construction that surrenders of sovereign authority must appear in unmistakable terms. United States v. WinstarCorp., 518 U.S. 839, 860 (1996) (plurality *Page 31 
opinion). It embodies the common sense presumption that governments do not ordinarily agree to curtail their sovereign or legislative power.Id. at 921 (Scalia, J., concurring in the judgment). As stated in Bowen v. Public Agencies Opposed to Social SecurityEntrapment, "Sovereign power . . . governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless surrendered in unmistakable terms." 477 U.S. 41, 52 (1986) (quotingMerrion v. Jicarilla Apache Tribe, 455 U.S. 130, 148 (1982)). Recognizing that legislation is ordinarily subject to change, the United States and Rhode Island Supreme Courts require that the Legislature's intent to create contractual rights against the State must be unmistakably clear. R.I. Bhd. of Corr. Officers v.State, 357 F.3d 42, 45 (1st Cir. 2004); Brennan,529 A.2d at 638 (citing Dodge, 302 U.S. at 79).
The party asserting the creation of a statutory contract thus bears a weighty burden to overcome the presumption that one legislature cannot bind another and legislative enactments merely declare policies "to be pursued until the legislature shall ordain otherwise." Brennan,529 A.2d at 638 (quoting Dodge, 302 U.S. at 79). A litigant seeking to overcome this hurdle, however, may rely on "not only the words used [in the statute] but also apparent purpose, context, and any pertinent evidence of actual intent, including legislative history." R.I. Laborers' Dist. Council v. State,145 F.3d 42, 43 (1st Cir. 1998).
Accordingly, in examining the nature of the relationship between Plaintiffs and the State, the Court will begin with the language of the statute and the circumstances surrounding it. See RetiredAdjunct Professors, 690 A.2d at 1345; Brennan,529 A.2d at 638-39; see also Hoffman, 909 F.2d at 614. Unlike a number of other states, Rhode Island has not expressly stated in its constitution or the ERSRI that pension benefits are contractual in nature. Compare
R.I. Const. and §§ 36-8-1 — 36-10.1-4, with
N.Y. Const. art. V, § 7 and
Mass. Gen. Laws ch. 32, § 25(5). *Page 32 
Plaintiffs submit that the use of the word "vest" in § 36-10-9 and § 16-16-12 is a clear indication that the General Assembly intended to bind itself contractually. This Court, however, is not convinced. "Vesting," as used in the ERSRI, refers to the status of a pension in which "the right to be paid is not subject to forfeiture if the employment relationship terminates before the employee retires." Black's Law Dictionary
1563 (6th ed. 1990); see also NEA II,172 F.3d at 28 (rejecting argument that use of word "vesting" in ERSRI created a contract). This construction is bolstered by § 36-10-11, expressly stating that a pensioner has a vested right to a service retirement allowance even if he or she withdraws from service prior to reaching the retirement age so long as he or she has completed ten years of service on or before July 1, 2005. Indeed, despite the vernacular widely used among courts, this Court finds that use of the term "vesting" in contract clause analysis serves only to further cloud what are already very murky waters.See, e.g., Pierce, 910 P.2d at 296 ("Statutory language conferring vested rights does not necessarily confer contractual rights. Rather, contractual rights may create a vested right."). The Court will analyze this contract issue using a contract analysis.
Next, Plaintiffs contend that the statutory guaranty that annual appropriations will be made to "meet [the state's] obligations to the extent provided in this chapter" clearly evinces a legislative intent to create a binding contract. Sec. 36-10-7. Again, the Court is not convinced. "To the extent provided in this chapter" indicates that § 36-10-7 is nothing more than a funding mechanism for the ERSRI as it exists during that appropriations cycle. See NEAII, 172 F.3d at 28 (concluding ERSRI's guaranty "falls at least a step short of clearly expressing a contractual commitment not to change benefit levels").
For their part, Defendants suggest that § 36-11-12 of the State Labor Relations Act, which bars collective bargaining as to any ERSRI benefits, is a recognition on the part of the *Page 33 
General Assembly that pension benefits are not contractual in nature.[9] The Court finds Defendants' argument no more convincing than Plaintiffs'. If this Court is to infer anything at all from § 36-11-12, it is that the General Assembly intended to "protect[] the fiscal integrity of the pensions systems [and] assure[] public employees that their entitlement to pension benefits is secure and should not be threatened by the vagaries of labor negotiations." Uricoli, 449 A.2d at 1273 (inferring statutory removal of public pensions from labor negotiations reflected pension systems' "importance as a term and condition of public employment").
Analysis of the statute's language, however, does not end the Court's inquiry. See R.I. Laborers' Dist. Council,145 F.3d at 43 (discussing broad array of evidence a court may consider in deciding whether a statute creates contract rights). The Court will now examine the facts and circumstances and ultimately resolve this issue based on contract law principles. As such, the Court shall decide: (1) whether the State offered to enter into a contract with its pensioners; (2) whether the pensioners accepted that offer; and, if so, (3) whether the contract was supported by sufficient consideration to render the contract valid. Restatement (Second) of Contracts § 22, 71 (1981); see D'Oliveira v.Rare Hospitality Int'l, Inc., 840 A.2d 538, 540 (R.I. 2004) (describing elements of a contract); Filippi v. Filippi,818 A.2d 608, 623-24 (R.I. 2003) (same).
As to whether the State offered to enter into a contract with its pensioners, the Court is particularly mindful of theAlmeida Court's reasoning that the "major purposes underlying public pensions [are] to induce people to enter public employment and continue faithful and diligent employment and to furnish public employees with employment stability and financial *Page 34 
security." Almeida,611 A.2d at 1387 (quoting Uricoli, 449 A.2d at 1276). Indeed, one commentator explained:
 "The universally recognized primary objectives of retirement plans are to enable the employer to attract better employees, to reduce turnover, to facilitate orderly retirement of older employees, to retain valuable employees who might seek more productive employment elsewhere, and, most importantly from the employee viewpoint, to assure a measure of income upon retirement adequate to allow the annuitant to live in reasonable security." Rubin G. Cohn, Public Employee Retirement Plans — The Nature of Employees' Rights, 1968 Ill. L. Forum 32, 40.
It follows that the ERSRI provisions at issue constituted offers intended to do just that — "induce people to enter public employment" and to continue in that employment over a substantial period of time. Almeida, 611 A.2d at 1387. An offer, as defined in the Restatement (Second) ofContracts § 24, is a "manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his [or her] assent to that bargain is invited and will conclude it." If one major purpose of public pensions is to induce people to enter into public employment and to maintain that employment, then certainly the General Assembly intended the ERSRI to constitute an offer inviting acceptance as defined by the ERSRI's retirement eligibility terms. See NEA II,172 F.3d at 28 (citing McGrath, 88 F.3d at 17) ("The existence of an employer-employee relationship does weigh in favor of finding an implied contract.").
Such purposes are a clear indication of the "bargained-for-exchange" missing from the facts before our Supreme Court in Retired Adjunct Professors. There, no bargained-for-exchange could be found because the ERSRI had never promised the retired professors any future employment with the State. See Retired Adjunct Professors, 690 A.2d at 1345. Rather, the ERSRI merely provided for the receipt of pension benefits during the initial days of post-retirement *Page 35 
state employment, should such employment be offered. The facts here are quite different and warrant a different conclusion. The General Assembly, through the ERSRI, offered a retirement allowance and COLA as a form of deferred compensation not subject to collective bargaining. See Catania v. State Emps. Ret. Bd.,450 A.2d 1342, 1345 (Pa. 1982) ("Once the benefits are deemed to be a form of deferred compensation, an employee obtains certain contractual rights."). In exchange, the state sought the acceptance of public employment and the "faithful and diligent" completion of that employment over a number of years, defined by years of service and/or reaching a certain retirement age. This "promise for performance" exchange is the hallmark of unilateral contract.See 1 Joseph M. Perillo, Corbin onContracts § 3.16 (Rev. ed. 1993) ("The most common form of a unilateral contract is that in which the offeror makes a promise and asks some performance by the offeree in return. . . ."). Upon full performance, acceptance of the offer is complete, and the offeror loses the power of revocation. See id. § 2.29; cf. Fine v.Hoffman, 88 R.I. 1, 143 A.2d 294 (1958) (discussing obligation of seller to pay realtor commissions where realtor acted on express or implied authority in obtaining a ready, willing and able purchaser).
Here, having completed ten years of service, Plaintiffs have partially performed. However, Plaintiffs had not fully performed at the time of the challenged enactments because they had not reached the statutory retirement age. Thus arises the "[q]uery: What remedy has offeree when offeror revokes offer for unilateral contract after partial performance by the offeree?"Sylvestre v. State, 214 N.W.2d 658, 667 (Minn. 1973) (quotingHartung v. Billmeier, 66 N.W.2d 784, 789 n. 6 (Minn. 1954)). As a general rule, "[w]here one party makes a promissory offer in such form that it can be accepted by the rendition of the performance that is requested in exchange, without any express return promise or notice of acceptance in words, the *Page 36 
offeror is bound by a contract just as soon as the offeree has rendered part of the requested performance." See Perillo,supra, at § 2.29; see also Restatement (First) ofContracts § 45 (1932) (explaining part performance binds offeror in contract but "the duty of immediate performance . . . is conditional on the full consideration being given"). In the case of pension offers, more than mere part performance may be necessary to render the offer irrevocable; some courts have sought substantial performance. See Perillo,supra, at § 2.29 (collecting cases). As a matter of law, the Court holds that ten years of contributory service is substantial.See Singer, 607 P.2d at 474 (holding eleven, sixteen, and twenty-two years of service constituted "substantial services");cf. Booth v. Sims, 456 S.E.2d 167, 184 (W. Va. 1995) (presuming detrimental reliance after ten years of service). The major purpose behind the ERSRI to retain long-term employees supports this conclusion as does the General Assembly's clear choice to establish ten years as the point at which pension rights vest.[10]
In addition to offer and acceptance, the contract between Plaintiffs and the State must be supported by consideration.See NEA I, 890 F. Supp. at 1159 (citing Hayes v.Plantations Steel Co., 438 A.2d 1091, 1094 (R.I. 1982)) (reciting that, like express contracts, implied-in-fact contracts require consideration). "[C]onsideration consists either in some right, interest or benefit accruing to one party or some forbearance, detriment, or responsibility given, suffered or undertaken by the other." Hayes, 438 A.2d at 1094 (citing Dockery v.Greenfield, 86 R.I. 464, 136 A.2d 682 (1957); Darcey v.Darcey, 29 R.I. 384, 71 A. 595 (1909)). Plaintiffs have contributed a significant percentage of their salaries to the ERSRI, as well as extended service to the State. In exchange, the State has committed to providing a retirement allowance and COLA. Thus, this implied unilateral contract is not unenforceable for want of consideration. *Page 37 See Bd. of Trs. of the Pub. Emps.' Ret. Fund v. Hill,472 N.E.2d 204, 209 (Ind. 1985) (holding six percent salary contribution and eight to twenty-two years of service satisfied legal requirement of consideration).
Although "state courts have generally viewed a public pension plan as creating implied-in-fact unilateral contracts," the Court is mindful that its approach has been the subject of criticism.See Parker, 123 F.3d at 6. For one, implied unilateral contract theory has been characterized as too inflexible, not allowing the General Assembly to adjust to changes in the fiscal climate. See Pineman, 488 A.2d at 810; Baker,718 P.2d at 352. Defendants maintain that this Court's holding would "cement" the law and forever bind future legislatures. This is simply untrue. Finding the existence of a contractual relationship is but one step in contract clause analysis. See R.I. DepositorsEcon. Prot. Corp., 659 A.2d at 106 (applying three-prong test to determine whether enactment impaired obligation of contract). Whether the 2009 and 2010 Acts have substantially impaired the contract as it exists between Plaintiffs and Defendants is not the issue before this Court. Nor does this Court make any findings as to whether the Acts were, nevertheless, "reasonable and necessary to carry out a legitimate public purpose" such that they have not violated Plaintiffs' rights under the Contract and Takings Clauses.See Brennan, 529 A.2d at 638. In sum, the three-prong test traditionally used in contract clause analysis provides the necessary flexibility so that future legislatures may do what is "reasonable and necessary" to adjust to changes in the fiscal climate.
In addition, the implied unilateral contract theory has been criticized for straining settled contract law principles; namely, for allowing unilateral contract modification under certain circumstances. See Pineman, 488 A.2d at 810; Baker,718 P.2d at 352. These concerns are similarly unfounded in light of accepted contract clause jurisprudence. The three-prong test *Page 38 
implicitly accepts the notion that the State may unilaterally alter or completely nullify its own contracts so long as such changes are "reasonable and necessary to carry out a legitimate public purpose."[11] See U.S. Trust Co. of N.Y.,431 U.S. at 16 ("[I]t is not every modification of a contractual promise that impairs the obligation of contract. . . ."); seealso Allen v. City of Long Beach,287 P.2d 765, 767 (Cal. 1955) (citations omitted) ("An employee's vested contractual pension rights may be modified prior to retirement for the purpose of keeping a pension system flexible to permit adjustment in accord with changing conditions and at the same time maintain the integrity of the system."); Taylor v. State andEduc. Emps. Group Ins. Program, 897 P.2d 275, 279 (Okla. 1995) ("[M]odifications, in addition to being necessary, reasonable, and providing offsetting advantages to any disadvantages, will be approved only if they do not impair the actuarial soundness of the fund, or detrimentally affect vested rights. . . .").
Defendants envision an ERSRI under which the State may, with or without justification, significantly alter or completely terminate a public employee's pension benefits at any time — even just one day — before retirement. In light of the major purposes underlying public pensions, as recognized by our own Supreme Court, such a construction of the ERSRI is untenable. See Almeida,611 A.2d at 1387 (discussing pensions' dual purposes to induce people to accept and maintain public employment and to ensure employees' financial security (citing Uricoli,449 A.2d at 1276)). Given our Supreme Court's renouncement of the gratuity *Page 39 
approach, such a construction is likewise inconsonant. Seeid. at 1385 (rejecting notion that pension is gratuity of state);see also Hammond, 627 P.2d at 1056 (equating rule that pension rights vest only upon retirement with gratuity theory because rule depends "in some degree upon the anachronistic notion that such benefits are in the `nature of a bounty springing from the appreciation and graciousness of the sovereign'" (quotingBlough v. Ekstrom, 144 N.E.2d 436, 440 (Ill. App. Ct. 1957))). The case law does not preclude but rather supports this Court's holding that Plaintiffs, as ten-year veterans of the State, possess a contractual relationship with the State pertaining to retirement allowances and COLA benefits which are not subject to collective bargaining. See Almeida, 611 A.2d at 1385 (discussing realization of contractual rights and obligations under contract and deferred compensation theories); see also NEA II,172 F.3d at 29 ("happily" deferring issue of whether long-term state employees enjoy statutorily-created contractual relationship with State with regard to retirement allowance).
 IV Conclusion
After due consideration of the arguments advanced by counsel, as well as the language and circumstances of the statute before it, the Court holds that Plaintiffs possess implied unilateral contract rights arising from the ERSRI and denies Defendants' Motion for Summary Judgment. Counsel shall submit the appropriate order for entry.
[1] Plaintiff labor unions include: Rhode Island Council 94, AFSCME, AFL-CIO; National Education Association Rhode Island; Rhode Island Federation of Teachers and Health Professionals; Rhode Island Brotherhood of Correctional Officers; International Federation of Professional and Technical Engineers Local 400; National Association of Government Employees, Local 79; Rhode Island Employment Security Alliance, Local 401; and Rhode Island Alliance of Social Service Employees, Local 580.
[2] Since 1995, state employees have contributed eight and three-quarters percent and teachers have contributed nine and one-half percent of their salaries to the ERSRI.See § 36-10-1 (defining deduction from compensation for state employees); G.L. 1956 § 16-16-22 (defining deduction from compensation for municipal school teachers).
[3] Plaintiffs correctly point out that although no amendments to the ERSRI adversely affected these ten-year veterans prior to 2009, multiple amendments passed to their benefit.See, e.g., P.L. 1985, ch. 331, §§ 1, 2 (reducing years of service for retirement eligibility from 38 to 35 years); P.L. 1987, ch. 209, § 1 (reducing years of service for retirement eligibility from 35 to 30 years); P.L. 1989, ch. 126, art. 55, §§ 1, 2 (reducing years of service for retirement eligibility from 30 to 28 years).
[4] Unlike state employees, municipal school teachers with less than ten years of service as of July 1, 2005, were entitled to a maximum seventy-five percent, rather than eighty percent, allowance even before the 2009 Amendment.See § 16-16-13(b).
[5] A couple of states still adhere to the gratuity theory by name. Indiana, for one, subscribes to the traditional theory that mandatory public pension plans provide mere gratuities whereas voluntary plans afford public employees pre-retirement contractual rights. Compare Haverstock v. State Pub. Emps. Ret. Fund,490 N.E.2d 357, 360-61 (Ind. Ct. App. 1986) (mandatory participation),with Bd. of Trs. of the Pub. Emps.' Ret. Fund v. Hill,472 N.E.2d 204, 208-09 (Ind. 1985) (voluntary participation). The Texas Supreme Court has also held fast to the notion that pension rights are "subordinate to the right of the Legislature to abolish the system, diminish the accrued benefits, . . . change the eligibility for benefits or to otherwise alter or modify the method of payment of the benefits." Cook v. Emps. Ret. Sys. of Tx.,514 S.W.2d 329, 331 (Tex. Civ. App. 1974).
[6] Judicial pensions are granted by the State pursuant to G.L. 1956 § 8-3-8, a separate provision from the ERSRI.
[7] Interestingly, the Retired Adjunct Professors Court made no reference to its own prior Almeida decision. The Court presumes that this is because the issue in Retired AdjunctProfessors was framed as whether plaintiffs had a contractual right to future employment rather than whether plaintiffs had a right to pension benefits during future state employment.
[8] Defendants emphasize the Arena Court's acknowledgment that — although the COLA benefit vested entirely upon retirement — "the city ha[d] broad discretion to prospectively change the pension benefit plan for firefighters and police officers whoha[d] not yet retired by enacting a new ordinance."Arena, 919 A.2d at 393 (emphasis in original). There, the COLA was subject to change through collective bargaining, and the ordinance creating the COLA benefit clearly indicated that rights were defined as of the date of retirement. Accordingly, the plaintiffs could not reasonably have believed that their years of service were in exchange for unalterable COLA benefits. In light of the Arena Court's reliance on the collective bargaining process from which the COLA was born, as well as the express language of the ordinance itself, this Court is not convinced that the cited language is of any import here.
[9] Section 36-11-12 reads in its entirety: "Any and all matters relating to the employees' retirement system of the state of Rhode Island are excluded as negotiable items in the collective bargaining process."
[10] The Court need not decide whether less than ten years of contributory service is sufficient to render Defendants' offer irrevocable.
[11] Defendants argue that if the ERSRI provisions at issue were truly a contract, then the General Assembly could not alter them at all — either to the benefit or the detriment of Plaintiffs. Because multiple changes have been made to Plaintiffs' benefit, Defendants reason, the provisions must not constitute a contract. Defendants' reasoning is flawed because under accepted contract clause analysis, an enactment must substantially impair a contractual right in order to be unconstitutional. Enactments inuring to the benefit of Plaintiffs are not impairments, but rather enhancements.

 *Page 1